Fee
Due
FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

2011 JUL 13 PM 12:52

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT CALIF
LOS ANGELES

BY_____

HARMAN SANDHU
    Petitioner,

vs.

UNITED STATES OF AMERICA
    Respondent.

)
)
)
)
)
)
)
)
)
)

CIV. NO.

**CV11 05749 CJC (AGR)**

530

MOTION CHALLENGING TERMS OF CONFINEMENT PURSUANT
TO USC§2241

COMES NOW the petitioner,pro se,[1] in the above aforementioned
and entitled cause and moves this Honorable Court for an order gr-
anting this Motion Challenging the Terms of his Confinement Pursuant
to 28 USC 2241 for the good reasons adduced herein.

BACKGROUND AND PROCEDURAL HISTORY

Petitioner was originally arrested upon the 19th of June,2007.
Pursuant to a stipulated plea agreement petitioner pled guilty and
upon the 15th of September,2009,was sentenced to a prison term of 28
months to be followed by a three year period of supervised release.
A strong recommendation for his participation in the federally man-
dated drug awareness program was part and parcel of his sentencing.
Petitioner entered the Residential Drug Awareness Program(hereafter
"RDAP") and successfully completed the unit based(prison based) com-

1. Haines vs. Kerner,404 U.S.519(1972) liberal construction of pro
   se litigation

LODGED
CLERK, U.S. DISTRICT COURT

JUL - 1 2011

CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

ponent and upon the 19th day of October 2010, was released to a comm-
unity correctional center and soon thereafter to home confinement to
both continue his reintegration into society and to complete the fi-
nal community based component of the RDAP.Events herein related begin
just prior to his release to community corrections,continue through
his violation,and form the basis of this brief.

### STATEMENT OF FACT

While domiciled at the Federal Prison Camp located at Lompoc,Ca-
lifornia and completing the prison based component of RDAP,petitioner
was prescribed the anti inflammatory non narcotic drug Naproxen for
recurring and medically documented pain in his knees.Just prior to his
release petitioner was given an additional supply of Naproxen to take
with him to his community corrections center to hold him over until
other arrangements could be made through a personal physician.Upon
his release and upon presenting himself at the CCC,petitioner,as is
standard policy,turned over the Naproxen to CCC staff who were in
accordance with such practice as a great number of CCC inmates take
medication for any number of reasons and "pill line" is a very reg-
ular feature of incarcerated or semi incarcerated life.

Within a semi-free environment of home confinement and with more
discretionary time at his disposal,petitioner began to exercise again
and with that exercise came the return of pain.Petitioner renewed his
prescription through a private physician, meanwhile continuing to pur-
sue both his societal goals and his RDAP obligations.

On February 22,2011, at approximately 8:30 p.m. and after a full
day of work,petitioner arrived at the CCC to provide a urine specimen
for drug analysis,a common and random procedure administered to all

= 2 =

CCC and home confinement inmates whether RDAP inmates or not.

Several weeks prior to petitioner's test submission,the Bureau of Prisons,in order to combat what it deemed to be a growing problem of avoidance of detection of illegal substances by urinalysis through increased fluid consumption,adopted a policy considering a "diluted" urine sample the equivalent of refusing to submit a sample,with similar sanctions applicable.This hastily conceived and ill administered policy neglected to consider a plethora of common non prescription and prescription medicine whose chief side effects are the retention of water and the need to ingest greater amounts of fluids due to increased thirst.

During the submission of his sample,petitioner noticed the clarity of his specimen,and with the new regulation in mind,reminded the CCC assistant director Mark Gambala about the prescribed medication he was taking and its well documented side effects.Gambala,responded with marked indifference to the ramifications inherent in such clarity,merely telling petitioner to try and monitor his fluid intake a little more carefully in the future.

Approximately two days later petitioner was alerted at his home and told to report back to the CCC immediately.Upon presenting himself,he was informed that his recent urine sample had beed graded "diluted" and that an incident report would be written and that his home confinement was suspended pending the reports final disposition.Petitioner responded that he was taking a Bureau of Prisons prescribed medication,renewed by his private physician and that its clinically proven and well documented side effects were entirely consistent with the results of his sample.A cursory check of medical logs by non medical

= 3 =

personnel did not reflect petitioners medication and an incident report was written,thus beginning a draconian chain of deliberate indifference to both well settled scientific evidence and the petitioners constitutionally guaranteed right of due process.

The following Monday and with not a scintilla of advance notice, petitioner was brought into the office of assistant director Gambala for his initial CDC (community disciplinary committee) hearing .He was given no opportunity to produce voluminous and,petitioner avers,dispositive evidence of his actual innocence,including documentation of his original Bureau of Prisons prescription for Naproxen,the renewed prescription by his private physician including a letter attesting to the drugs universally known side effects,statements by federally funded and regulated testing laboratories further attesting the drugs side effects,a formal statement by the FDA citing the need to review all "diluted" specimens for valid reasons relating to the dilution as a constitutional duty of due process,as well as hair and blood samples which would show conclusively that petitioner was taking a mild,non narcotic pain reliever duly prescribed by the same arm,if a different finger of the Bureau of Prisons.All petitioner was allowed was the briefof statements in his own behalf,at which point assistant director Gambala found sufficient evidence to forward the incident report to the Disciplinary Hearing Officer(DHO) for final disposition.

Petitioner began at once to marshal the above evidence in preparation for the upcoming hearing,feeling sure a presentation of said evidence before a more neutral party would exonerate him completely. Petitioner was told on Monday,March 6th that a telephonic hearing would be held on Tuesday March 7th and that he should not leave the facilty to go to work.Unfortunately,in lieu of a hearing,petitioner was

= 4 =

instead greeted by United States Marshals who escorted him back to
the facility at Lompoc,violated for taking the very medication pre-
scribed for him by Lompoc physicians.

## ARGUMENT

### 1. Standard of Review

Habeas Corpus relief extends to a person in custodyunder the au-
thority of 28 USC §2241.Relief is available if a federal prisoner can
show that " he is in custody in violation of the laws or treaties of
the United States". 28 USC ; 2241(C)(3). A section § 2241 is the pro-
per vehicle for seeking relief where,as here,a federal prisoner chall-
enges the manner, location,or conditions of the execution of his sen-
tence.See Hernandez v. Campbell,204 F.3d 861,864-65(9th Cir. 2000).

### DISCUSSION

The Supreme Court has set forth three types of claims that may
be brought against the government under the Due Process clause of the
Fourteenth Amendment.The first clause incorporates many of the spec-
ific protections defined in the Bill of Rights "A plaintiff may bring
suit for an officials violation of his rights to freedom of speech,
unreasonable search and seizure..." Zinermon v. Burch,494 U.S. 113
125, 110 S. Ct. 975.983,108 L.Ed. 2d 100 (1990).Second,the Due Pro-
cess clause contains a "guarantee of fair procedure". ID. In procedural
due process claims,the deprivation of a constitutionally guaranteed and
protected interest in "life,liberty,or property,is not in itself uncon-
stitutional; what is unconstitutional is the deprivation of such an
interest without due process of law". ID. (citing Parrat v. Taylor,451
U.S. 527,537,101 S. Ct.1908.1913, 68 L.Ed 2d 420(1981);Carey v. Piphus
435 U.S. 247,259, 98 S.Ct. 1042,1950,55 L Ed. 2d. 252(1978).In such

circumstances, the constitutional violation is not complete until the government fails to provide due process. A third type of constitutional protection is substantive due process. The substantive component of the due process clause bars certain arbitrary, wrongful government actions " regardless of the fairness of the methods used to implement them." **Daniels v. Williams, 474 U.S. 327, 331 106 S.Ct. 662, 665, 88 L.Ed.2d. 662(1986).** The right to be free from arbitrary actions is a substantive due process right that arises directly from the Constitution. **Regents of University of Michigan v. Ewing, 474 U.S.214, 229-230, 106 S.Ct.507, 515 88 L.Ed. 2d 523(1985).** As to this type of claim, the constitutional violation is complete when the wrongful action is taken, regardless of whether or not post deprivationremedies have been put into place. **Daniels v. Williams, Supra.; Weller v. Department of Social Services, 901 F. 2d. 387, 391(4th Cir. 1990); Gilmore v. City of Atlanta, 774 F. 2d 1495, 1500 (11th Cir. 1985)(en banc),** <u>cert. denied</u>**, 476 US 1115, 106 SCt 1970, 90 LEd2d 654 (1986))**"there are no precise standards for determining what governmental actions are proscribed by substantive due process.")

Plaintiff relies on the substantive component of due process. "Each new claim to [substantive due process] must be considered against a background of constitutional purpose, as they have been rationally perceived and historically developed." **Regents of University of Michigan v. Ewing**, supra. The due process clause in and of itself confers a liberty interest in freedom from government actions that are arbitrary, capricious, and a abuse of discretion or not in accordance with law, and while certain elements of the above have been immunized from judicial scrutiny under the Administrative Pro-

cedures Act, this court may consider whether the agency has acted
outside its statutory limits or has violated the Constitution. 5 USC
§ 706(2)(A); **Wallace v. Christensen,** 802 F2d 1539 (9th Cir. 1986)(en
banc).

In the case at bar each and every action taken by Community
Corrections Center personnel and leading inexorably towards Plaintiff's
violation may be considered arbitrary, capricious, unfounded in both
administrative and federal law and in direct conflagration with the
14th Amendment and its guarantee of due process.

Had a proper perusal of the medical log been initialed by medi-
cal personnel rather than security/administrative personnel, Peti-
tioner's prescriptions would have been immediately validated, nipping
this justiciable controversy in the bud, instead of permitting its
poisonous fruit to flourish. Had CCC assistant director Gambala been
less concerned with his rush to judgment and afforded Petitioner his
constitutionally guaranteed right to present evidence of his inno-
cence, the incontrovertible and undisputable nature of that evidence
may have sobered his indiscriminatory abuse of discretion and caused
him to rule on the evidence rather than to merely find enough damning
evidence to pass it along to the disciplinary hearing officer with a
recommendation to violate. Finally had Petitioner been afforded a
hearing before the "DHO" as is his ironclad constitutional right, the
indisputable nature of the evidence tendered would have, Plaintiff
avers, been dispositive. "The Constitution requires a hearing before
the government may deprive a person of liberty or property. **Zinermon
v. Bush,** 404 US 113, 127, 110 SCt 975, 108 LEd2d 100 (1990).

= 7 =

## CONCLUSION

Plaintiff was deemed in violation of the conditions of his "release" by one arm of the Bureau of Prisons for taking a prescribed non-narcotic medication issued to him by a different arm of that same Bureau of Prisons. Plaintiff claims herein that had assistant director Gambala and other unknown members of the CCC staff acted in accordance with Plaintiff's constitutional rights and not in an arbitrary and capricious manner, that the evidence tendered would have proved dispositive in nature and shown his actual innocence. Indeed, the words of another branch of our government, the Food and Drug Administration (FDA) seem fitting at this juncture:

> "The FDA requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test, and when the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring a Medical Review.
> If during that review process a medical diagnoses or legally obtained prescription for medication requiring or affecting ingestion of fluids is verified the dilution found in the specimen is to be seen as valid and necessary and no adverse action should be taken."

At every turn within the Bureau of Prisons Petitioner has been thwarted, with no opportunity to present what he considers evidence dispositive in nature. He has exhausted the Administrative Remedy process and now turns to this court for relief. Petitioner seeks a forum for his evidence and an immediate transfer back to community corrections and/or home confinement and credit for elapsed time during his stay at Lompoc, and any other relief this court deems just and proper.

Respectfully submitted,

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

| From: Sandhu, Harman | 17008-097 | A | FCI LOMPOC |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL** Concomitant to an incident report and attendant disciplinary proceedings, I Had my community correction privelages, including my home confinement revoked, and I was returned to a more secure federal correctiona institution with an increase in my custody classification. I was also stripped of 75 % of my yearly accrued good con time I herein aver my actual innocence and offer the following statement and corroborative documentation in support thereof.

Prior to my urine submission, I voiced concern to my doctor concerning my excessive thirst and urination, to which my doctor instructed me to increase my fluid intake to prevent dehydration and possible kidney damage. The Same physician prescribed me Naproxen after the halfway house misplaced my prescription I had arrived with from Lompoc.

On February 22, at approximately 8:30 I arrived after work to the halfway house to provide an urine analysis. After noticing the clear appearance, I expressed concern to Director Gambala, who displayed marked indifference, telling me merely to "reduce my fluid intake." Director Gambala was unaware of my prescription or medical instructions that I was under.

On February 25, I was told of my diluted Urine analysis and told to return to the halfway house.

A cursory and erroneous check of the medical prescription log by non-qualified security staff led to the opinion that I was not taking any medication that would result in a diluted sample, and therefore issued an incident report. I in fact was taking prescribed medication, which had been reported upon my arrival, and then misplaced by staff as mentioned above.( please see attached documents)

I then offered to submit hair samples, which are commonly considered prima facie forensic evidence of guilt or innocence, which was erroneously dismissed as "time elapsed" by Dan Painter of the Sacramento BOP office after a mere six days, a claim entirely refuted by any reputable and federally-certified laboratory,which use a 90 day window before a given sample is rendered invalid. (Please see included documentary evidence.)

**(continued on attached)**

| 5/09/11 | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

---

| | |
|---|---|
| DATE | REGIONAL DIRECTOR |

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 637780-R2

**Part C—RECEIPT**

CASE NUMBER: _____

| Return to: | | | |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

Sandhu, Harman - Fed. Reg. No. 17008-097 - A Unit - FCI Lompoc - ADMINISTRATIVE REMEDY APPEAL:  CONTINUED

This rush to judgement continued with a CDC hearing on or about the 27th of February, at which Director Mark Gambala,
once again refused to acknowledge the correlation between my medication  Naproxen and a diluted urine sample.
A statement so falacious and contrary to all medical and scientific evidence that it must impugn the integrity
of the proceeding if not the individual.
        Given these antecedants, and the fact that I was denied adequatettme to provide the proper documents,
it is no surprise that my final disciplinary hearing before the DHO resulted in me being found guilty of the
charged offense. I was taken back into custody and had to wait until being provided the DHO report on March 18th
before filing an appeal.
        The enclosed documentation  its organization and coherent presentation have now become available and
considering irrefutable documentation is essential, I am requesting my case be reviewed and reexamined  It is  in
fact irrefutable that I, contrary to the initial report, was indeed taking prescribed medicine at the time of
my testing that would have led to a diluted sample. (Please see enclosed corroborative evidentiary exhibits.)
A comprehensive medical review of the prescription log, rather than a cursory check by security personnel, would
have made this abundantly clear and prevented this turn of events from taking place.
        It is likewise irrefutable that the prescribed medication ingested by me had an adverse effect of "excessive
thirst," and "excessive urination" which necessarily increases fluid intake  including the instructions of my
physician which can then lead to a diluted urine sample.  This has been established by any number of professional
manuals, medical schools, and perhaps most importantly, federally certified labs and government sponsered websites,in
stark contrast and contrary to the CDC findings that no correlatiye relationship exists between my medication
and diluted samples.  (please see corroborative evidentiary exhibits.)
        Furthermore, Susan  Ramsden owner and operator of Comprehensive Medical Inc (CMI), a federally regulated
and approved drug testing facility, states in her attached declaration that :

        "FDA requires all federally certified labs to include a statement on all dilute test results reflecting
        the need for a medical review of all dilute specimens to account for alternative explanations for a dilute
        test, and when the results of a test may be viewed as a breach of duty resulting in a loss of privileges
        there nay exist a constitutional duty of due process requiring a Medical Review.

        If during that review process a medical diagnoses or legally obtained prescription for medication requiring
        or effecting ingestion of fluids is verified the dilution found in the specimen is to be seen as valid
        and necessary and no adverse action should be taken."

I aver that the above instances constitute 'plain error' and warrant a reversal in and of themselves.
        Had the disciplinary process been continued pending documentary evidence, had hair samples been tendered
as I had offered and still offer (the 90 day window of validity is still open)as a means of authenticating my
innocence  had any number of checks and balances been administered by qualified medical personnel, this rush
to judgment would have been stopped in its tracks.  As it stands, in the light of the documented evidence made
part of this appeal, I now feel that the greater weight of the evidence now tends to exonerate rather than implicate
and I am requesting an immediate reversal of sanctions, including restoration of my good conduct time, restoration
of time earned through my successful completion of the Residential Drug Program (RDAP) and a prompt release from
incarceration.


                                        Respectfully Submitted,


                                        Harman Sandhu

637780-R2
FCC Lompoc

You are requesting administrative relief regarding the decision of the Center Discipline Committee (CDC) on February 28, 2011, which was certified by the Discipline Hearing Officer (DHO) on March 3, 2011, in which you were found to have committed the prohibited act of Refusing to Provide a Urine Specimen for Drug Testing, Code 110, while at the Cornell Companies Inc., Oakland Center, CA.   You make various claims which have been addressed below.   For relief, you ask to be exonerated of the charge, your sanctions and privileges be reversed.

On appeal, the appropriate reviewing authority shall consider: (a.) Whether the UDC or DHO substantially complied with the regulations on inmate discipline; (b.) Whether the UDC or DHO based its decision on some facts, and if there was conflicting evidence, whether the decision was based on the greater weight of the evidence; (c.) Whether an appropriate sanction was imposed according to the severity level of the prohibited act; and (d.) other relevant circumstances.

A review of the disciplinary action indicated that you were provided due process as required by Program Statement 7300.09, Community Corrections Manual.   You were given advance written notice of the charge against you prior to the hearing before the CDC.   You were afforded an opportunity to request a staff representative and witnesses.   You waived both these rights.   You were provided a CDC hearing at which you were provided an opportunity to make a statement to the CDC and to present documentary evidence on your behalf.   Your statement is reflected in the record and addressed by the CDC.   There is no indication in the record that you presented documentary evidence.

The CDC detailed in the report the basis for finding that you committed the prohibited act.   You were sanctioned by the DHO in accordance with policy.

You claim that you are innocent.   Bureau of Prisons policy directs the CDC to consider all evidence presented at the hearing and shall make a decision based on some facts, and if there is conflicting evidence, it must be based on the greater weight of the evidence.   Though you deny the charge, it is apparent that the CDC found you guilty based on the greater weight of evidence. Evidence weighed against you included the statement of the reporting officer and the documentary evidence included in the record.

You claim that the diluted specimen was caused by the side effects of your prescribed medication (Naproxen).   The purpose of the urine surveillance program is to detect and deter drug use by inmates.   Acts that circumvent the accurate testing and reporting of drug use adversely affects staff's ability to provide a safe environment for residents.   Whether intentional or not, your provision of a diluted urine specimen interfered with the orderly running of the institution.

In your appeal you claim you were not afforded the opportunity to present evidence in your defense.   The record indicates you did not present evidence at the time of your in-person hearing.   Inmates are afforded the opportunity to present evidence at the UDC, DHO or CDC hearing, not during the appeal process.   This is not the forum to request such action.

637780-R2
FCC Lompoc

We find that staff afforded you the appropriate due process protections for inmate discipline actions and that staff met the evidentiary standard required for finding that you committed the prohibited act. Therefore, any request for relief from this discipline action or sanctions is denied.

If dissatisfied with this response, you may appeal to the Office of the General Counsel, Bureau of Prisons, 320 First Street, NW, Washington, D.C., 20534. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

_6/7/11_
DATE

ROBERT E. MCFADDEN, Regional Director

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

| From: | H  Sandhu, Harman | 17008-097 | A | FCI LOMPOC |
|-------|-------------------|-----------|---|------------|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**   Although a detailed exposition and analysis of the incident in question together with its repercussions is enclosed as my BP10, a reiteration of certain indisputable facts seems essential here, in order that the heart of the events as they occurred may be seen free of the argumentation that surround its periphery, and also to take note of the utter falaciousness of the Regional response. The following facts are supported by the record; either the record of the instant incident, or Sandhu's comprehensive BOP file previous to the event in question. 1. While at the Federal Prison Camp located at Lompoc, California where he was successfully completing the 500 hour Drug Awareness Program, inmate Sandhu was taking the anti-inflamatory "Naproxen" on a regular basis to combat pain, as prescribed by prison health officials. Upon completing the program and his transfer to home confinement, Sandhu left prison camp and "Naproxen" left with him as dictated by the medical staff. 2. As his discretionary time increased, Sandhu began exercising again and with that exercise came the return of pain. Sandhu then went to a private physician and had his original BOP authorized Naproxen prescription renewed. The taking of medication to relieve pain, (pain in this case documented by the BOP), is as inculcated across all strata of society as eating, including federally funded drug awareness programs. 3. Previous to his test the BOP had recently installed a new policy where a "diluted" urine would now be considered analogous to a "refusal to submit" a urine sample with the same sanctions applicable. 4. On February 22, 2011 Sandhu provided his randomly scheduled urine test. Three days later this test returned a "diluted" result and Sandhu was told to return to the halfway house where the events detailed in his BP10 unfolded. 5. It is an established fact and well documented by any number of physicians, medical manuals, medical schools, and perhaps most importantly, federally certified testing laboratories that the chief side effect of Naproxen is excessive thirst and the concomitant increased fluid intake and urination. The CDC (Central Discipline Committee) finding that no correlation exists between the two flys in the face of all accepted medical and scientific literature. 6. The Federal Drug Administration (FDA) "Requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test, and when the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring Medical Review.

(continued on attached)

| DATE | SIGNATURE OF REQUESTER |
|------|------------------------|

**Part B—RESPONSE**

| DATE | GENERAL COUNSEL |
|------|-----------------|

ORIGINAL: RETURN TO INMATE                     CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|----------------------------------|----------|------|-------------|

SUBJECT: _____

| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |
|------|-------------------------------------------------|

Sandhu, Harman     17008-097                                        Page 2 of 2

If during that review process a medical diagnoses or legally obtained prescription for medication requiring or effecting
ingestion of fluids is verified the dilution found in the specimen is <u>to be seen as valid and necessary and no adverse</u>
<u>action should be taken.</u>"

    It seems to be even clearer than my urine sample that the half way houses zeal to enforce its new dilution policy
blinded their eyes to the complete legitimacy of my actions. Their heavyhandedness is apparent through all phases of
their procedure; from their initial cursory check of their medical logs and the conclusion that I was not taking <u>any</u>
medication, to their refusal to accept hair samples as "time elapsed" when they were anything but to their "no correla-
tion" decision made by non medical personnel where literally reams of correlation exist.

    The Regional response basically says that whether I am taking prescribed medicine or not my handing in a diluted
sample interfered with the orderly running of th institution. How can this be? Does the taking of certain medication
originally prescribed by BOP physicians interfere with the orderly running of the institution? If not how can a urine
sample that bespeaks that medication violate BOP policy.

    Inmate Sandhu understands that within an incarceration mileau further particularized by both general urine sampling
and the inmate's specific DAP requirements that a strict policy need be adhered to and enforced. Yet it was the need to
establish illigitimacy that led to the FDA's statement concerning alternate explanations concerning dilute tests and the
constitutional duty of due process.

    Inmate avers that the use of this prescribed medicine was wholly legitimate across all phases of the process and th
a reasonable trier of fact could come to no other conclusion. In light of that inmate asks that all sanctions be immedi-
ately removed, all time spent under sanction be credited towards his home confinement and that he be immediately release
to any home confinement term that may remain.

                    Respectfully submitted,

Section 5
SANDHU Harman
Reg. No. 17008-097
The CDC reviewed your investigative paperwork and reflected that you
SANDHU, Harman Reg. No. 17008-097 received a copy of the charges against
you, were read your rights, waived your 24 hour notice, and requested no staff
representatives, and no witnesses. The CDC finds that you, SANDHU, Harman
Reg. No. 17008-097 committed the prohibited act of BOF Code: CODE 110
Refusing to provide a urine sample or to take part in other drug-abuse testing.
The CDC considered the written account of the reporting staff member which
states the following:

On January 22, 2011, a, approximately 1500 hours I. Marion Brisco, Chief or
Security received information from Redwood Toxicology Laboratory that
indicated Chain of Custody specimen number 110280 was confirmed Dilute for
creatinine. After a verification of FEBRUARY 2011 urinalysis log, chain of
custody number 110280 was submitted by Pre-Release client SANDHU Harman
Reg. No. 17008-097. Mr. Sandhu was tested on February, 22 2011 at 2040 hours by
F. Adenyi Monitor I. A review of the GEO CARES inc medication log reflected
that Mr. Sandhu. Harman was not taking prescription medication that would
result in a DILUTED sample at the time the test was administered.

Based on the above facts Mr. Sandhu Harman. Reg. No. 17008-097 is being cited
for BOF Code 110 Refusing to provide a urine sample or to take part in other
drug-abuse testing

The CDC considered the fact that you exercised your right to appear before the
CDC. The CDC took into account your statements regarding a new NAPROXEN
prescription on 2/3/2011 and reviewed the Medication Policy which states: "All
medications, prescriptions or non-prescriptions are to be turned in to staff at the
time you sign into the facility", which you failed to do while on home
confinement. The CDC took into consideration that your Case Manager has no
record of you going to the Doctor or the Pharmacy. I also took into consideration
that the Redwood Toxicology Laboratory staff specialist indicated that she has no
knowledge of any correlative relationship between the medication Naproxen and
diluted creatinine samples.  The CDC considered the fact that you did not
present any evidence to refute the reporting officer's written account of the
incident. I find that the greater weight of the evidence supports the finding that
you, Sandhu, Harman Reg. No. 17008-097 committed the prohibited act of: BOF
Code 110 Refusing to provide a urine sample or to take part in other drug-abuse
testing.

| Part III – Investigation | 22. Date And Time Investigation Began 2-27-11 |
|---|---|

23. Inmate Advised Of Right To Remain Silent: You are advised of your right to remain silent at all stages of the discipline process. Your silence may be used to draw an adverse inference against you at any stage of the discipline process. Your silence alone may not be used to support a finding that you have committed a prohibited act.

The Inmate Was Advised Of The Above Right By ⟨signature⟩    At (Date/time) 2/27/11 @ 1151

24. Inmate statement and attitude

On Tuesday (2-22-2011) Dondhu reported in for UA and reports that Monitor J, Bmi A., "failed to ask [him] about meds". Reports that he used the restroom once w/ in the 20 minute wait period. Client reports that he was to take Naproxen which side effects include "increased urination" and "increased volume of pale, dilute urine" according to drugs.com. (Client provided print copy)

25. Other facts about the incident, statements of these persons present at scene  disposition of evidence, etc.
         prescribed
Client has reported he was ~~or~~ Naproxen since his arrival, verified through Sect of case file (orientation/Monitor M. Ko). Reports he hasn't been taking it until around his approved home confinement date. Client will provide verification for prescription during CDC hearing.

MEDICINE PRESCRIPTION SUBMITTED UPON ARRIVAL. NEW PRESCRIP ONLY BECAUSE HALFWAY HOUSE STAFF "MISPLACED" THE MEDICINE

26. Investigator's comments and conclusions

   Client is to provide prescription at CDC hearing time as evidence

27. Action taken

   Refer to CDC

Date And Time Investigation Completed 2-27-2011    1206 HRS

Printed Name,Signature Of Investigator Michael Chomi ⟨signature⟩    Title CASE II

The Chairman of the Center Discipline Committee will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by him/her to be necessary for an appreciation of the circumstances surrounding the charge(s). Repetitive witnesses need not be called. Unavailable witnesses may be asked to submit written statements.

Date, sign, and return this form to the Chairman of the Center Discipline Committee.

| Date | Inmate Signature/Reg. No. |
| --- | --- |
| 2/27/11 | 19008-097 |

| Notice of hearing given to inmate by   Employee Signature | Date |
| --- | --- |
|  | 12-27-2011 |

This form may be replicated via WP.

This form was previously produced in this Federal Forms pkg.

## WAIVER OF 24 HOUR NOTICE

I have been advised that I have the right to have a written copy of the charge(s) against me at least 24 hours prior to appearing before the Center Discipline Committee. I wish to waive this right and proceed with the Center Discipline Committee hearing at this time.

| Signed by Inmate | Inmate Typed or Printed Name | Register No. |
|---|---|---|
|  | HARMAN SANDHU | 17008-097 |
| Date and Time Inmate Signed | Witnessed by (Employee Signature) | |
| 2/27/11   1214 |  | |

This form may be replicated via WP.

**Incident Report**
**Attachment Q**

U.S. Department of Justice
Federal Bureau of Prisons

## Discipline Report   CSC 9WM

Page 1

| Name of Inmate: | Register Number: | Hearing Date | Hearing Time |
|---|---|---|---|
| Sandhu Harman | 17008-097 | 2/28/2011 | 2050 hours |
| Date of Incident: | Date of Incident Report: | Prohibited Act(s) Code | |
| 2/22/2011 | 2/25/2011 | 110 | |

Refusing to provide a urine sample or to take part in other drug-abuse testing

| Notice of Charge(s) | Date: 3-3-11 | DHO Name (Printed/Signature) RANDY MCWILLIAMS/ Randy mcwilliams |
|---|---|---|

| | Date | Time | By |
|---|---|---|---|
| Advance Written Notice of charges: | 2/25/2011 | 1715 hrs. | Marlon Brisco Chief of Security |
| The CDC Hearing was held on: | 2/28/2011 | 2050 hrs. | Mark Gambala Assist Facility Director |
| The inmate was advised of his rights: | 2/27/2011 | 1214 hrs. | Michel Khem Case Manager II |

**II Staff Representative**

| Yes | No | NA | |
|---|---|---|---|
| X | | | Inmate waived right to staff representative |
| | X | | Staff declined or could not appear but the inmate was advised of option to postpone hearing to obtain another staff representative with the result that |

A. Inmate has been advised of his right to present a statement or to remain silent, to present documents, including written statements of unavailable witnesses, and for relevant and material witnesses to appear in his behalf at the hearing.

| | Admits | Denies |
|---|---|---|
| Inmate admits/denies charge(s) | | X |

B. Summary of Inmate Statement: I am innocent, the medication I am taking (NAPROXEN) has side effects, which include increased urination and increased volume of pale dilute urine.

| C. Witnesses: | NA | Yes | No |
|---|---|---|---|
| | | NA | |
| 1. The inmate requested Witnesses | | NA | |
| 2. The following Persons were called as witnesses at this hearing and appeared: | | NA | |
| 3. Summary of testimony of each is attached? | | NA | |
| 4. The following persons requested were not called for the reason(s) given: | | | |

4/5/2011 [Inmate illegible]

[illegible] CASEManager [illegible]

- INMATE   UNABLE TO FILE UR
  4/18 DUE TO LACK OF

Page 2

| 5. Unavailable witnesses were requested to submit written statements and those statements were considered? | NA |
|---|---|
| D. Documentary Evidence: In addition to the Incident Report and Investigation, the Committee considered the following documents. | |
| E. Confidential Information was considered by the CDC and not provided to inmate | X |

IV. Finding of the Committee

| X | a. The act was committed as charged. |
|---|---|
| | b. The following act was committed: |
| | c. No prohibited act was committed: Expunge according to your Statement of Work. |

V. Specific Evidence Relied On To Support Findings

**See Attached**

VI. Sanction Recommendation

Sanctions
1. **Suspended Disciplinary Transfer**
2. **Revocation of Home Confinement**
3. **Forfeit 75% Good Conduct Time**

VII. Reason for Sanction Recommendation

This type of action is a serious offense, which disrupts individual programming and jeopardizes the security of the reentry center. A suspended Disciplinary Transfer, Revocation of Home Confinement and forfeit of 75% of good conduct time will hopefully deter this type of action in the future.

VIII. Appeal Rights

The inmate has been advised of the findings; specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal under the Administrative Remedy Procedure or by letter within 20 days of the imposition of the sanction to the Regional Director. A copy of this report will be sent to the inmate.

IX. Discipline Committee

| Chairperson | Member | Member09 |
|---|---|---|
| **Mark Gambala** | | |

X. Action by DHO

TRANSFER.
DISALLOWED 40 HRS GCT.

| DHO Name (Typed and Signature) | Date |
|---|---|
| RANDY mc williams | 3-3-? |

 Federal Bureau of Prisons



| SUITE NAME AND ADDRESS: | SPECIMEN NUMBER: 110280 |
|---|---|
| Oakland Center (364) - Client 205 MacArthur Blvd Oakland, CA 94610 | ACCOUNT NUMBER: 10084 |
| | SPECIAL TESTS REQUESTED: |

INSTITUTION CODE

INSTITUTION SECURITY LEVEL

1. To the extent possible, urine samples should be collected in one or two centralized areas of the institution, e.g. Lieutenant's office or R & F staff who are thoroughly familiar with the procedures described below.

2. Inmates shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample. Prior to collecting the sample, a staff member shall complete all blocks of the Chain of Custody form except for Time Provided and Collector and Inmate Certification.

3. When the inmate reports for testing, staff shall make a positive identification of the inmate, shall collect a specimen from the inmate under direct observation, shall complete time provided information, shall ensure that the specimen bottle is tightly capped and shall affix a label containing the specimen number to the Urine Surveillance Log. Ordinarily, to be submitted for testing, bottles should be full.

4. The inmate shall verify that the specimen numbers (i.e. barcode numbers) on the Chain of Custody form, on the peel-off barcode, and on the numbered label to be affixed to the Urine Surveillance Log are identical.

5. After verification, the collector shall affix the barcode and security seals to the specimen bottle. The inmate shall be asked to initial the security seal and to read and sign the Inmate Certification Statement.

6. The staff member collecting the specimen shall read and sign the Collector Certification Statement. If the inmate refuses to sign the Inmate Certification or initial the security seal, a second staff member shall also sign the Collector Certification and shall initial the security seal.

7. After samples are collected, they shall be maintained under direct staff observation until moved to a locked area where they may be stored until mailing. This area shall be designated by the Urine Surveillance Program Coordinator and should be one which is accessible to few, with limited number of staff and to no inmates.

8. All samples shall be sent to Redwood Toxicology Laboratory for collection from the first working day after they are collected.

9. When a positive result is received, an incident report shall be written unless medical staff indicates a positive result is due to authorized medication. A photocopy of both the laboratory report and the Chain of Custody form retained at the institution, contain for the inmate to sign, registration number and specimen number shall be attached to the incident report and made part of the inmate's discipline record.

TEST REASON:

INMATE NAME: Sandy Harman

REGISTER #: 17868-097

DATE COLLECTED: 2/22/11    TIME REQUESTED: 2035    TIME PROVIDED: 2040

COLLECTOR CERTIFICATION: I certify that the specimen identified on this form is the specimen presented to me by the donor, that this form accompanying the specimen to collection, that it was sealed in the donor's presence and that the information on this form and label is correct.

INMATE CERTIFICATION: I certify that the specimen accompanying this form is my own and that I provided it to the collector, further I certify that the specimen was sealed in my presence and that the information on this form and label is correct.

Inmate Witness Signature

Inmate Witness Signature



GEO
*Care*

## RECORD OF URINE TESTING

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | MONTH OF: | | | Febuary | |
| RESIDENT NAME: | Sandhu, Harman | | REG #: | 17008 - 097 | |
| ARRIVAL DATE: | 10/19/2010 | | RELEASE DATE: | | 4/8/2011 |
| STATUS: | DCC | PL | SC | PR | PT |
| RISK CATEGORY: | AFTERCARE | > | RANDOM | | |

## CHAIN OF CUSTODY FORM TO USE:

· ____x____ BOP _____ PROBATION _____ PRE-TRIAL

| Staff Intls.<br>PAT DOWN | (BAR CODE: Chain of Custody Form) | DATE: | TIME: | STAFF: | RESULTS (+/-) DATE RECEIVED) |
|---|---|---|---|---|---|
| *HB* | 110794 | 2/5/11 | 1230 | *HB* | Neg. 2/26/ |
| *J* | 110891 | 2/11 | 1200 | *J* | |
| *HB* | 110170 | 2/5/11 | 1317 | *HB* | Neg. 2/26/ |
| *P* | 110280 | 2/2/11 | 2010 | *G* | |
| | | | | | |
| | | | | | |

REDWOOD
TOXICOLOGY
LABORATORY

3650 Westwind Blvd  Santa Rosa  CA 95403
Phone 707 577-7956 / 800 255 2150
Fax 707 577-7355
www.redwoodtoxicology.com

Oakland Center (106) - Client
205 MacArthur Blvd
Oakland, CA 94610

| ACCOUNT NUMBER | ACCESSION NUMBER |
|---|---|
| 60084 | 110224-12426 |

| IDENTIFICATION |
|---|
| 110280 Req# 110280 |

| ORDERED BY |
|---|
| Oakland Center (106) - Client |

| NOTES |
|---|
|  |

| COLLECTED |
|---|
| 2/22/2011 |

| RECEIVED | REPORTED |
|---|---|
| 2 24/2011 | 2/25/2011 |

| POSITIVES | TEST | RESULT |
|---|---|---|
|  | Creatinine Specimen is dilute | 13.6 mg/dL |
|  | Opiates | None Detected |
|  | Benzodiazepines | None Detected |
|  | Barbiturates | None Detected |
|  | Methadone | None Detected |
|  | Phencyclidine (PCP) | None Detected |
|  | Cocaine (Benzoylecgonine) | None Detected |
|  | THC (Marijuana) EIA cutoff level is 20 ng/ml. | None Detected |
|  | Amphetamines | None Detected |

NOTE:

The results for this specimen have been tested in accordance with all Redwood Toxicology Laboratory standard operating procedures and have been reviewed by laboratory certifying scientists.

Chief Toxicologist: Wayne Ross, M.C.L.S

110224-12426     2 25/2011 2:38:09 PM

Laboratory Directors:
Mark J. DeVec M.D
Richard R. Wilber, M.D



REDWOOD
TOXICOLOGY
LABORATORY

3850 Westwind Blvd  Santa Rosa  CA 95403
Phone 707 577-7955  /  800 792-2155
fax 707 577-7966
www.redwoodtoxicology.com

Oakland Center (106) - Client
205 MacArthur Blvd
Oakland, CA 94610

| ACCOUNT NUMBER | ACCESSION NUMBER |
|---|---|
| 60064 | 110224-12426 |

| IDENTIFICATION |
|---|
| 110280 Req# 110280 |

| ORDERED BY |
|---|
| Oakland Center (106) - Client |

| NOTES |
|---|
| |

| COLLECTED |
|---|
| 2/22/2011 |

| RECEIVED | REPORTED |
|---|---|
| 2/24/2011 | 2/25/2011 |

| POSITIVES | TEST | RESULT |
|---|---|---|
| | Creatinine<br>Specimen is dilute | 13.6 mg/dL |
| | Opiates | None Detected |
| | Benzodiazepines | None Detected |
| | Barbiturates | None Detected |
| | Methadone | None Detected |
| | Phencyclidine (PCP) | None Detected |
| | Cocaine (Benzoylecgonine) | None Detected |
| | THC (Marijuana)<br>EIA cutoff level is 20 ng/mL | None Detected |
| | Amphetamines | None Detected |

NOTE:

The results for this specimen have been tested in accordance with all Redwood Toxicology Laboratory standard operating procedures and have been reviewed by laboratory certifying scientists.

Chief Toxicologist, Wayne Ross, M.C.L.S.

110224-12426        2/25/2011 2:33:05 PM

Laboratory Directors:
Mark J. DeMee, M.D.
Richard R. Wilber, M.D.

Confidential document. Specimens may be analyzed at facilities receiving specimens and kept 2 days. For most cases specimens kept 6 months. All methadone maintenance urines kept 2 months.

BP-S308.073  INCIDENT REPORT (CDC S) CDFAM
AUG 99

## U.S. DEPARTMENT OF JUSTICE

### FEDERAL BUREAU OF PRISONS

1. Name of CCC: Cornell Companies Inc. - Oakland Center
   Part I - Incident Report

| 2. Name of Offender: Sandhu Harman | 3. Register Number: 17008-097 | 4. Date of Incident: 02/22/2011 | 5. Time: 0040 hrs |
|---|---|---|---|

| 6. Place of Incident:Cornell Companies-Oakland Center | 7. Component: | 8. Type of Offender: Pre-Release |
|---|---|---|

9. Incident: CODE 110 Refusing to provide a urine sample or to take part in other drug-abuse testing

Description of Incident   Date: 1-25-2011   Time: 1100 hrs staff became aware of the incident:

On January 22, 2011, at approximately 1500 hours, I, Marlon Brisco, Chief
of Security received information from Redwood Toxicology Laboratory that
indicated Chain of Custody specimen number 110290 was confirmed Dilute
for creatinine. After a verification of FEBRUARY 2011 urinalysis log,
chain of custody number 110290 was submitted by Pre-Release client SANDHU
Harman Reg. No. 17008-097. Mr. Sandhu was tested on February. 22 2011 at
0040 hours by F. Adenyi Monitor I. A review of the GEO CARES Inc
medication log reflected that Mr. Sandhu, Harman was not taking
prescription medication that would result in a DILUTED sample at the time
the test was administered.

Based on the above facts, Mr. Sandhu Harman Reg. No. 17008-097 is being
cited for BOP Code 110 Refusing to provide a urine sample or to take part
in other drug-abuse testing

| 11.Signature of Reporting Employee | Date & Time: 1/25/2011 1500 hrs | 12. Name & Title (Printed): Marlon Brisco Chief of Security |
|---|---|---|

| 13. Incident Report Delivered to Above Offender By: | 14. Date Incident Report Delivered 2-25/11 | 15. Time Inciden. Report Delivered 1715 |
|---|---|---|

Record Copy - Central File Record; Copy - DHO; Copy - Inmate After CDC Action; Copy - Inmate Within 24 hours of Part I Preparation.

(This form May Be Replicated Via WP)                    Replaces BP-308 CDC of MAY 94

BP-A0286.072  INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RDC'S)  CDFRM

MAR 94

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

GEO CARE INCORPORATED - OAKLAND CENTER
Facility

As an inmate charged with a violation of Center rules or regulations referred to the Discipline Committee for disposition, you have the following rights:

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the Center Discipline Committee;

2. The right to have a member of the staff who is reasonably available represent you before the Center Discipline Committee;

3. The right to call witnesses and present documentary evidence in your behalf, provided Center safety would not be jeopardized;

4. The right to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act;

5. The right to be present throughout the Center Discipline Committee hearing except during Committee deliberations and except where Center safety would be jeopardized;

6. The right to be advised of the Center Discipline Committee recommendation and Bureau of Prisons' decision, the facts supporting the recommendation and decision, except where Center safety would be jeopardized, and the disposition in writing; and,

7. The right to contest under Administrative Remedy procedures or by letter the Bureau of Prisons' decision to the Regional Director within 20 days of notice of the decision and disposition.

I hereby acknowledge that I have been advised of the above rights afforded me at a Center Discipline Committee hearing.

Signed: _____    Reg. No.: 13708-097    Date: 2/20/11

Notice of rights given to inmate on 2-20-11    By: _____
                                     Date            Employee Signature

**INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RDC's)**

Facility

When an inmate has been advised of the rights afforded at a Center Discipline hearing, but refuses to sign the acknowledgment, the following should be completed.

I have personally advised _____ of the above rights afforded
                          Inmate's name and Register No.
at a Center Discipline Committee hearing; however, the inmate refuses to sign the acknowledgment.

Signed: _____

_____
(Employee's Typed Name)

_____
(Date)

BP-A207.073
MAR 1994

## NOTICE OF CENTER DISCIPLINE COMMITTEE
## HEARING (CCC'S)

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| Date | Facility |
|---|---|
| 2-27-2011 | GEO CARE INCORPORATED - OAKLAND CENTER |
| **Inmate** | **Register Number** |
| Ho Sandhu, Harman | 17009-097 |

Alleged Violation(s)

Refusing to provide a urine sample or to take part in other drug-abuse testing

| Date of Offense | Code Number |
|---|---|
| 2-22-11 | 110 |

You are being referred to the Center Discipline Committee for the above charge(s)

The hearing will be held on 2-26-11 at 2050,

at the following location GEO CARE OAKLAND Center

You are entitled to have a staff member represent you at the hearing. Please indicate below whether you desire to have a staff representative, and if so his or her name

Inmate's initials _____ ( ) I do) wish to have a staff representative

Inmate's initials HK ( X ) I do not wish to have a staff representative

If so the staff representative's name is

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf, provided calling your witnesses will not jeopardize Center safety. Names of witnesses you wish to call should be listed below. Inmate's initials _____ Briefly state what each proposed witness would be able to testify to:

Name N/A _____ Can Testify to: _____

Name N/A _____ Can Testify to: _____

Name N/A _____ Can Testify to: _____

March 17, 2011

Baljit S. Gill, M.D.
251 Shrike Circle
Sacramento, CA 95834
(530) 682-1378
CA license No: A113101
DEA No: FG2108391

To Whom It May Concern:

I am writing this letter on behalf of Mr. Harman Sandhu regarding his recent placement in custody. I am a Physician specialized in the field of Internal Medicine and currently working as an Internal Medicine Hospitalist in Oroville, CA. I am well aware of Mr. Sandhu's current predicament and hope that I could shed some light on side effects of a certain medication that was prescribed by myself to Mr. Sandhu.

Mr. Sandhu has been under my care and treatment for tendonitis of his knees. In addition to rest, he was prescribed a Non-Steroidal Anti-inflammatory drug (NSAID) called Naproxen. This class of medications is considered first-line treatment in tendonitis.

Shortly after beginning course of treatment, Mr. Sandhu expressed to me that he indeed was experiencing excessive thirst and urination. He was instructed to increase his fluid intake in order to avoid dehydration. In my experience, what Mr. Sandhu was experiencing is a well-known and established adverse effect of taking NSAIDs. He was experiencing excessive thirst caused by Naproxen use. I strongly believe that this increase in fluid intake is what caused Mr. Sandhu to have a dilute urine sample and was simply a result of a side effect of a common medication. Mr. Sandhu was given medical advice to increase his fluid consumption in order to combat the excessive thirst and to avoid more serious complications associated with Naproxen use such as kidney dysfunction and damage. I have seen many other patients with similar complaints in my practice and give similar advice to them.

Excessive thirst is a side effect of naproxen and other NSAIDs that is well documented in medical literature. It can also cause deleterious effects on kidney function, and as a result, common for patients to be told to maintain adequate hydration while taking this medication, as was Mr. Sandhu. I have enclosed information from professional health care and National Institute of Health- backed websites for patients that clearly list these as adverse effects of naproxen use.

It is also well established that increasing fluid intake can lead to excessively dilute urine. In my professional experience, it is quite certain that Mr. Sandhu had a dilute urine sample because of a side effect he experienced as a result of naproxen use. I feel without a doubt that Mr. Sandhu's symptoms were due to established side effects of naproxen, which was prescribed to him for a medical condition.

Please feel free to contact me for any additional questions or clarifications. I hope this provides clarification on the situation Mr. Sandhu is facing. I have enclosed some information from credible sources on the use and side effects of naproxen for further verification. Similar information can also be found in medical textbooks such as Merck Manual.

Thank You,

Baljit S. Gill, M. D

# USC
UNIVERSITY
OF SOUTHERN
CALIFORNIA

# Keck School of Medicine
University of Southern California

## Department of Anesthesiology

March 17th, 2011

To Whom It May Concern:

I am writing a letter on behalf of Harman Sandhu regarding his recent custody placement. I am currently a physician in the State of California in the department of Anesthesiology specializing in cardiothoracic anesthesia at University of Southern California.

I am well aware of the nature regarding Mr. Sandhu's situation and am hoping to present evidence including personal experience that will show the following: That the use of non-steroidal anti-inflammatory drugs (NSAIDS) such as naproxen can cause excessive thirst leading to a dilute urine sample. This is a well-known and established side effect. Mr. Sandhu was prescribed naproxen for tendonitis, which is a first line treatment for such pathologies if the pain does not improve with rest.

In my experience I have given NSAIDs to my patients in the operating room for pain control and have noted the change in urine from concentrated yellow to clear color with concurrent administration of intravenous fluids. I am aware of this side effect and have often supplement the patient with fluids in order to prevent dehydration.

There are many studies that clearly state that with the use of naproxen a patient can develop excessive thirst which is a side effect and hence increase fluid intake; which can lead to a dilute urine sample. This is what occurred in Mr. Sandhu's case. In reference, Medline plus a website sponsored by the government clearly states the side effects of naproxen and that includes excessive thirst. I have placed the link below for verification. Further textbooks state (Merck Manual) that dry mouth can be associated with the use of this drug. The Merck Manual is considered the gold standard regarding drugs and their side effects.

In my opinion there is no "gray" zone regarding this being a side effect of naproxen. Many studies and many textbooks including the insert that is provided in the drug by the drug manufacturer clearly states that one of the adverse effects is thirst; hence causing a patient to have increased fluid consumption in turn causing dilute urine. I have provided the link to the insert that is provided with the purchase of the drug below.

Please feel free to contact me regarding any questions. I hope that this information clarifies a situation, which is simply due to a side effect of a medicine that is obtained over the counter; despite this Mr. Sandhu still obtained physician's prescription for this medicine.

1500 San Pablo Street, 4th Floor
Los Angeles, California 90033
Tel: 323-442-8843
Fax: 323-442-8627



**USC**
UNIVERSITY
OF SOUTHERN
CALIFORNIA

# Keck School of Medicine
University of Southern California

### Department of Anesthesiology

Sincerely,

Amardeep Heyer, MD
Cardiothoracic Fellow
aheyer@usc.edu
530-574-1640
Department of Anesthesiology
Keck School of Medicine
University of Southern California

Enclosures: 3
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html
http://www.drugs.com/pro/naproxen-tablets.html

1500 San Pablo Street, 4th Floor
Los Angeles, California 90033
Tel: 323-442-8843
Fax: 323-442-8627



**Comprehensive**
**medical inc**
since 1992

I, Susan Ramsden, declare:

1.     I am a resident of Sacramento County. I make this declaration from my own knowledge. I could and would testify as to the matters contained in this declaration if called to do so.

Dr. Dwight Bass MD

2.     I have owned and operated Comprehensive Medical Inc (CMI) for 19 years. CMI conducts drug and alcohol testing for the Sacramento, Yolo, El Dorado and Placer County criminal and civil courts.

Gerald Roeseler MD

3.     I am a Forensic Toxicology Analyst and a Juris Doctor. Every day I am responsible for conducting over 75 medical reviews of drug tests to look for alternative explanations for the analytical analysis. I am trained and educated in pharmacology, pharmacokinetics and pharmacodynamics.

Sue Ramsden
Toxicology Analyst, JD

4.     Urine drugs-of-abuse testing conducted at federally certified labs undergo additional testing to check the veracity of the specimen. This testing includes identifying evidence of adulteration, substitution and dilution.

Tony Petrakovitz
Corporate Educator

5.     Exhibit #1, attached, is a 2  page document from Redwood Toxicology Laboratory, entitled "Urine Creatinine" suggesting that subsequent testing be performed when a donor produces a dilute specimen.

5.     Dilution occurs externally when a specimen donor adds fluid to their specimen after the urine has left their body.  Dilution occurs internally when a donor ingests more fluids than their body is accustomed to ingesting. Dilution is documented in the lab as the amount of creatinine per volume of fluid. Normal dilution levels are 100 to 250 mg/dl.

6.     Dilution may occur naturally due to a medical condition or medical guidance. Pregnancy, diabetes, high blood pressure, use of pain medications, kidney problems and use of diuretics will all cause the dilution of a person's urine. Occupational dilution occurs routinely for welders, roofers and farmers. Exercise enthusiasts can be temporally diluted for several hours after a work out.  Individuals dieting will often use diuretics causing dilution.

*dna testing*
*drug testing*
*pre-employment physicals*
*expert witness*
*required medical programs*
*workers compensation injury care*

7.     FDA requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test.

3600 Power Inn Road
Suite G
Sacramento, CA  95826

te: 916.454.1423
Fax: 916.454.2764

cmc_sac012 3yahoo.com
comprehensivemedical.us

8.     When the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring a Medical Review.

9.     If during that review process a medical diagnoses or legally obtained prescription for medication requiring or effecting ingestion of fluids is verified the dilution found in the specimen is to be seen as valid and necessary and no adverse action should be taken.



Member of the
Drug and Alcohol Testing
Industry Association

**your first line of defense**

Approved by FAA, FRA, FTA, PUC, CAL DOT, CHP, Coast Guard, Homeland Security, Member DATIA and American College of Forensic Examiners
Defense Seen in Court, Federally Regulated and Approved with over 4 million tests performed.
Our affiliates are First Advantage Corp, Foley Services, Choice Point, NSA, Xerox, Department of Justice, Blue Shield, Blue Cross, Medtox, Transplace to name a few.



**Comprehensive**
**medical inc**
since 1992

Declaration of Susan Ramsden PAGE 2 OF 2
March 23, 2011

10.    A medical review officer has the option of analyzing or ordering other test results to determine if the dilution was due to recent drug use.

Dr. Dwight Bass  MD

11.    Exhibit #2, attached, is a document by the nation's largest federally certified laboratory, Quest Diagnostics, entitled "Hair Testing for a 90 Day Drug Use History" stating that hair testing is forensically defensible.

Tanveer Singh  MD

12.    Exhibit #3, attached, is a document from Omega Laboratories, the nation's largest hair testing laboratory, entitled "Hair Testing FAQ", stating that hair testing covers approximately 90 days of use and there are no know ways to adulterate a hair test.

Arianna Sampson  PA-C

13.    Obtaining a hair test from a donor, when collected more than 10 days after a dilute urine test, would be a useful tool for the medical review officer to determine if a diluted specimen was an attempt to hide drug use.

Sue Ramsden  Administrator

I declare under penalty of perjury that the forgoing is true and correct and that this declaration was executed on March 23, 2011 in Sacramento, California.

_____ Susan Ramsden   March 23, 2011

dna testing
drug testing
pre-employment physicals
expert witness
required medical programs
workers compensation injury care

3600 Power Inn Road
Suite G
Sacramento, CA  95826

te: 916.454.1423
Fax: 916.454.2764

cmc_sac012@yahoo.com
comprehensivemedical.us



Member of the
Drug and Alcohol Testing
Industry Association

**your first line of defense**

Approved by FAA, FRA, FTA, PUC, CAL DOT, CHP, Coast Guard, Homeland Security, Member DATIA and American College of Forensic Examiners
Defense/Main Court, Federally Regulated and Approved with over 4 million tests performed
Our affiliates are First Advantage Corp, Foley Services, Choice Point NSA, Xerox, Department of Justice, Blue Shield, Blue Cross, Medtox, Transplace Insurance Inc.



Home  About Us  Site Directory  Privacy Policy

Search

| Background Screening | Health & Wellness | eReq |

| Employer Solutions Home | Customer Login | Collection Site Locator |

# Hair Testing for a 90-Day Drug Use History

Hair testing for drugs of abuse is the only drug-testing method available that provides up to a 90-day drug use history. This makes hair testing from Employer Solutions an ideal solution for pre-employment and random testing protocols.

Using FDA-cleared testing reagents, this lab-based test offers the advantages of easy specimen collection and highly accurate results that meet the same reference standards as urine testing. In addition, there are no known methods for sample adulteration (hair washing will not dilute the sample). Because specimen collection can be directly observed, the risk of adulteration is even further reduced.[1]

Fast turnaround of results is also available: Negative results are reported within 24 hours of receipt at the laboratory, and positive results are confirmed using gas chromatography/mass spectrometry (GC/MS) or gas chromatography/mass spectrometry/mass spectrometry (GC/MS/MS) within 48 to 72 hours. Hair testing is also forensically defensible.

When compared with urine specimen testing, hair testing provides nearly twice the number of positives and a longer detection window. In addition, Quest Diagnostics offers a comprehensive, nationwide collection network and provides online collection training.

## Standard 5-panel test:

|  | | |
|---|---|---|
| Amphetamines | 300 pg/mg | 300 pg/mg |
| Cocaine | 300 pg/mg | 300 pg/mg |
| Opiates* | 500 pg/mg | 500 pg/mg |
| PCP | 300 pg/mg | 300 pg/mg |
| THC-COOH | 1 pg/mg | 0.1 pg/mg |

*Confirmatory testing is available for standard or expanded opiates.







PRINT | CLOSE WINDOW

Ω OMEGA Laboratories

# Hair Testing FAQ

**1. What is Hair Drug Testing?**
Since hair growth is fed by the bloodstream, the ingestion of drugs of abuse is revealed by analyzing a small sample of hair. Our testing method measures the drug molecules embedded inside the hair shaft, eliminating external contamination as a source of a positive test result. Hair testing results cannot be significantly altered with shampoos or other external chemicals.

**2. What drugs are included in a standard Hair Drug Test?**
Cocaine, marijuana, opiates (Codeine, Morphine & 6-monoacetylmorphine), methamphetamine (Methamphetamine & Ecstasy) and phencyclidine (PCP). These five drug classes are mandated for testing by the Federal Government.

**3. What time period does a standard test cover?**
A standard test covers a period of approximately 90 days. The hair sample is cut as close to the scalp as possible and the most recent 1.5 inches are tested.

**4. Does hair color affect results?**
Hair color is determined by the amount of melanin in the hair. It has been shown experimentally through actual hair samples, as well as determined in court that hair color has NO basis in fact.

**5. How fast does head hair grow?**
Studies indicate that head hair grows on the average approximately 1.3 cm (or 1/2 inch) per month.

**6. How much hair is needed?**
A standard test with GC/MS confirmation requires 60+ milligrams of hair, or approximately 90 to 120 strands. The thickness of different types of head hair (thick coarse vs thinning fine) is the reason for this variation.

**7. How does Hair Testing compare to urinalysis?**
The primary differences are:
1) wider window of detection
2) inability to tamper with the test

Cocaine, methamphetamine, opiates and PCP are rapidly excreted and usually undetectable in urine 72 hours after use. The detection period for hair is limited only by the length of the hair sample and is approximately 90 days for a standard test.

At this time there are no known adulterants for hair tests. Since hair tests analyze the drugs inside the hair shaft, external contaminants/chemicals have no effect.

Additional advantages include non-intrusive collection procedures, virtual elimination of test evasion.

**U.S. National Library of Medicine**
*NIH* **National Institutes of Health**

# Naproxen
(na prox' en)

URL of this page: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html

## IMPORTANT WARNING:

People who take nonsteroidal anti-inflammatory drugs (NSAIDs) (other than aspirin) such as naproxen may have a higher risk of having a heart attack or a stroke than people who do not take these medications. These events may happen without warning and may cause death. This risk may be higher for people who take NSAIDs for a long time. Tell your doctor if you or anyone in your family has or has ever had heart disease, a heart attack, or a stroke, if you smoke, and if you have or have ever had high cholesterol, high blood pressure, or diabetes. Get emergency medical help right away if you experience any of the following symptoms: chest pain, shortness of breath, weakness in one part or side of the body, or slurred speech.

If you will be undergoing a coronary artery bypass graft (CABG; a type of heart surgery), you should not take naproxen right before or right after the surgery.

NSAIDs such as naproxen may cause ulcers, bleeding, or holes in the stomach or intestine. These problems may develop at any time during treatment, may happen without warning symptoms, and may cause death. The risk may be higher for people who take NSAIDs for a long time, are older in age, have poor health, or who drink three or more alcoholic drinks per day while taking naproxen. Tell your doctor if you take any of the following medications: anticoagulants ('blood thinners') such as warfarin (Coumadin); aspirin; other NSAIDs such as ibuprofen (Advil, Motrin) and ketoprofen (Orudis KT, Actron); or oral steroids such as dexamethasone (Decadron, Dexone), methylprednisolone (Medrol), and prednisone (Deltasone). Also tell your doctor if you have or have ever had ulcers, bleeding in your stomach or intestines, or other bleeding disorders. If you experience any of the following symptoms, stop taking naproxen and call your doctor: stomach pain, heartburn, vomit that is bloody or looks like coffee grounds, blood in the stool, or black and tarry stools.

Keep all appointments with your doctor and the laboratory. Your doctor will monitor your symptoms carefully and will probably order certain tests to check your body's response to naproxen. Be sure to tell your doctor how you are feeling so that your doctor can prescribe the right amount of medication to treat your condition with the lowest risk of serious side effects.

Your doctor or pharmacist will give you the manufacturer's patient information sheet (Medication Guide) when you begin treatment with prescription naproxen and each time you refill your prescription. Read the information carefully and ask your doctor or pharmacist if you have any questions. You can also visit the Food and Drug Administration (FDA) website (http://www.fda.gov/Drugs/DrugSafety/ucm085729.htm) or the manufacturer's website to obtain the Medication Guide.

## Why is this medication prescribed?

## What side effects can this medication cause?

Naproxen may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:

- constipation
- diarrhea
- gas
- sores in mouth
- excessive thirst
- headache
- dizziness
- lightheadedness
- drowsiness
- difficulty falling asleep or staying asleep
- burning or tingling in the arms or legs
- cold symptoms
- ringing in the ears
- hearing problems

Some side effects can be serious. If you experience any of the following symptoms, or those mentioned in the IMPORTANT WARNING section, call your doctor immediately. Do not take any more naproxen until you speak to your doctor:

- changes in vision
- feeling that the tablet is stuck in your throat
- unexplained weight gain
- sore throat, fever, chills, and other signs of infection
- blisters
- rash
- skin reddening
- itching
- hives
- swelling of the eyes, face, lips, tongue, throat, arms, hands, feet, ankles, or lower legs
- difficulty breathing or swallowing
- hoarseness
- excessive tiredness
- pain in the upper right part of the stomach
- nausea
- loss of appetite
- yellowing of the skin or eyes
- flu-like symptoms
- bruises or purple blotches under the skin
- pale skin
- fast heartbeat
- cloudy, discolored, or bloody urine
- back pain
- difficult or painful urination

Google AdWords

Start with
$75 of free
advertising
on us.*

| | |
|---|---|
| Inflammation of the Bladder | Severe |
| Bloody Urine | Severe |
| Bleeding Not Related to Menstrual Period | Severe |
| Inflammation of Skin caused by an Allergy | Severe |
| Erythema Multiforme | Severe |
| Toxic Epidermal Necrolysis | Severe |
| Stevens-Johnson Syndrome | Severe |
| Skin Rash with Sloughing | Severe |
| Itching | Severe |
| Lupus-Like Syndrome | Severe |
| Muscle Pain | Severe |
| Cramps | Severe |
| Coma | Severe |
| Mental Impairment | Severe |
| Hallucination | Severe |
| Feeling Faint | Severe |
| Seizures | Severe |
| Fit | Severe |
| Fever | Severe |
| Fast Heartbeat | Severe |
| Swollen Lymph Nodes | Severe |
| Wheezing | Severe |
| Trouble Breathing | Severe |
| Chest Tightness | Severe |
| Throwing Up Blood | Severe |
| Excess Urination | Severe |
| High Blood Sugar | Severe |
| Elevation of Proteins in the Urine | Severe |
| Abnormal Liver Function Tests | Severe |
| Life Threatening Allergic Reaction | Severe |
| Giant Hives | Severe |
| Reaction due to an Allergy | Severe |
| Low Blood Sugar | Severe |
| High Amount of Potassium in the Blood | Severe |
| A Rupture in the Wall of the Stomach or Intestine | Severe |
| Hemolytic Anemia | Severe |
| Acquired Decrease of All Cells in the Blood | Severe |
| Low Blood Counts due to Bone Marrow Failure | Severe |
| Anemia | Severe |
| Decreased Blood Platelets | Severe |
| Deficiency of Granulocytes a Type of White Blood Cell | Severe |
| Decreased White Blood Cells | Severe |
| Decreased Neutrophils a Type of White Blood Cell | Severe |
| Increased Eosinophils in the Blood | Severe |
| Confused | Severe |
| Mood Changes | Severe |
| Anxious | Severe |
| Pink Eye | Less Severe |
| Dry Mouth | Less Severe |

## Adverse Reactions

Adverse reactions reported in controlled clinical trials in 960 patients treated for rheumatoid arthritis or osteoarthritis are listed below. In general, reactions in patients treated chronically were reported 2 to 10 times more frequently than they were in short-term studies in the 962 patients treated for mild to moderate pain or for dysmenorrhea. The most frequent complaints reported related to the gastrointestinal tract.

A clinical study found gastrointestinal reactions to be more frequent and more severe in rheumatoid arthritis patients taking daily doses of 1500 mg naproxen compared to those taking 750 mg naproxen (see CLINICAL PHARMACOLOGY).

In controlled clinical trials with about 80 pediatric patients and in well-monitored, open-label studies with about 400 pediatric patients with juvenile arthritis treated with naproxen, the incidence of rash and prolonged bleeding times were increased, the incidence of gastrointestinal and central nervous system reactions were about the same, and the incidence of other reactions were lower in pediatric patients than in adults.

In patients taking naproxen in clinical trials, the most frequently reported adverse experiences in approximately 1% to 10% of patients are:

### Gastrointestinal (GI) Experiences, including:

heartburn*, abdominal pain*, nausea*, constipation*, diarrhea, dyspepsia, stomatitis

### Central Nervous System:

headache*, dizziness*, drowsiness*, lightheadedness, vertigo

### Dermatologic:

pruritus (itching) *, skin eruptions*, ecchymoses*, sweating, purpura

### Special Senses:

tinnitus*, visual disturbances, hearing disturbances

### Cardiovascular:

edema*, palpitations

### General:

dyspnea*, thirst

*Incidence of reported reaction between 3% and 9%. Those reactions occurring in less than 3% of the patients are unmarked.

In patients taking NSAIDs, the following adverse experiences have also been reported in approximately 1% to 10% of patients.

### Gastrointestinal (GI) Experiences, including:

flatulence, gross bleeding/perforation, GI ulcers (gastric/duodenal), vomiting

### General:

abnormal renal function, anemia, elevated liver enzymes, increased bleeding time, rashes

The following are additional adverse experiences reported in <1% of patients taking naproxen during clinical trials and through postmarketing reports. Those adverse reactions observed through postmarketing reports are italicized.

### Body as a Whole:

anaphylactoid reactions, angioneurotic edema, menstrual disorders, pyrexia (chills and fever)

### Cardiovascular:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


HARMAN SANDHU                        )          CIV. NO.
        Petitioner,                  )
                                     )
                                     )
vs.                                  )
                                     )
UNITED STATES OF AMERICA             )
        Respondent.                  )
                                     )
_____)


### MOTION CHALLENGING TERMS OF CONFINEMENT PURSUANT TO USC§2241

COMES NOW the petitioner,pro se,[1] in the above aforementioned
and entitled cause and moves this Honorable Court for an order gr-
anting this Motion Challenging the Terms of his Confinement Pursuant
to 28 USC 2241 for the good reasons adduced herein.

### BACKGROUND AND PROCEDURAL HISTORY

Petitioner was originally arrested upon the 19th of June,2007.
Pursuant to a stipulated plea agreement petitioner pled guilty and
upon the 15th of September,2009,was sentenced to a prison term of 28
months to be followed by a three year period of supervised release.
A strong recommendation for his participation in the federally man-
dated drug awareness program was part and parcel of his sentencing.
Petitioner entered the Residential Drug Awareness Program(hereafter
"RDAP") and successfully completed the unit based(prison based) com-

_____

1. Haines vs. Kerner,404 U.S.519(1972) liberal construence of pro
   se litigation

ponent and upon the 19th day of October 2010, was released to a comm-
unity correctional center and soon thereafter to home confinement to
both continue his reintegration into society and to complete the fi-
nal community based component of the RDAP.Events herein related begin
just prior to his release to community corrections,continue through
his violation,and form the basis of this brief.

## STATEMENT OF FACT

While domiciled at the Federal Prison Camp located at Lompoc,Ca-
lifornia and completing the prison based component of RDAP,petitioner
was prescribed the anti inflammatory non narcotic drug Naproxen for
recurring and medically documented pain in his knees.Just prior to his
release petitioner was given an additional supply of Naproxen to take
with him to his community corrections center to hold him over until
other arrangements could be made through a personal physician.Upon
his release and upon presenting himself at the CCC,petitioner,as is
standard policy,turned over the Naproxen to CCC staff who were in
accordance with such practice as a great number of CCC inmates take
medication for any number of reasons and "pill line" is a very reg-
ular feature of incarcerated or semi incarcerated life.

Within a semi-free environment of home confinement and with more
discretionary time at his disposal,petitioner began to exercise again
and with that exercise came the return of pain.Petitioner renewed his
prescription through a private physician, meanwhile continuing to pur-
sue both his societal goals and his RDAP obligations.

On February 22,2011, at approximately 8:30 p.m. and after a full
day of work,petitioner arrived at the CCC to provide a urine specimen
for drug analysis,a common and random procedure administered to all

= 2 =

CCC and home confinement inmates whether RDAP inmates or not.

Several weeks  prior to petitioner's test submission,the Bureau of Prisons,in order to combat what it deemed to be a growing problem of avoidance of detection of illegal substances by urinalysis through increased fluid consumption,adopted a policy considering a "diluted" urine sample the equivalent of refusing to submit a sample,with similar sanctions applicable.This hastily conceived and ill administered policy neglected to consider a plethora of common non prescription and prescription medicine whose chief side effects are the retention of water and the need to ingest greater amounts of fluids due to increased thirst.

During the submission of his sample,petitioner noticed the clarity of his specimen,and with the new regulation in mind,reminded the CCC assistant director Mark Gambala about the prescribed medication he was taking and its well documented side effects.Gambala,responded with marked indifference to the ramifications inherent in such clarity,merely telling petitioner to try and monitor his fluid intake a little more carefully in the future.

Approximately two days later petitioner was alerted at his home and told to report back to the CCC immediately.Upon presenting himself,he was informed that his recent urine sample had beed graded "diluted" and that an incident report would be written and that his home confinement was suspended pending the reports final disposition.Petitioner responded that he was taking a Bureau of Prisons prescribed medication,renewed by his private physician and that its clinically proven and well documented side effects were entirely consistent with the results of his sample.A cursory check of medical logs by non medical

= 3 =

personnel did not reflect petitioners medication and an incident report was written,thus beginning a draconian chain of deliberate indifference to both well settled scientific evidence and the petitioners constitutionally guaranteed right of due process.

The following Monday and with not a scintilla of advance notice, petitioner was brought into the office of assistant director Gambala for his initial CDC (community disciplinary committee) hearing .He was given no opportunity to produce voluminous and,petitioner avers,dispositive evidence of his actual innocence,including documentation of his original Bureau of Prisons prescription for Naproxen,the renewed prescription by his private physician including a letter attesting to the drugs universally known side effects,statements by federally funded and regulated testing laboratories further attesting the drugs side effects,a formal statement by the FDA citing the need to review all "diluted" specimens for valid reasons relating to the dilution as a constitutional duty of due process,as well as hair and blood samples which would show conclusively that petitioner was taking a mild,non narcotic pain reliever duly prescribed by the same arm,if a different finger of the Bureau of Prisons.All petitioner was allowed was the brief of statements in his own behalf,at which point assistant director Gambala found sufficient evidence to forward the incident report to the Disciplinary Hearing Officer(DHO) for final disposition.

Petitioner began at once to marshal the above evidence in preparation for the upcoming hearing,feeling sure a presentation of said evidence before a more neutral party would exonerate him completely. Petitioner was told on Monday,March 6th that a telephonic hearing would be held on Tuesday March 7th and that he should not leave the facilty to go to work.Unfortunately,in lieu of a hearing,petitioner was

= 4 =

instead greeted by United States Marshals who escorted him back to
the facility at Lompoc,violated for taking the very medication pre-
scribed for him by Lompoc physicians.

**ARGUMENT**

## 1. Standard of Review

Habeas Corpus relief extends to a person in custody under the au-
thority of 28 USC §2241.Relief is available if a federal prisoner can
show that " he is in custody in violation of the laws or treaties of
the United States". 28 USC ; 2241(C)(3). A section § 2241 is the pro-
per vehicle for seeking relief where,as here,a federal prisoner chall-
enges the manner, location,or conditions of the execution of his sen-
tence.See **Hernandez v. Campbell,204 F.3d 861,864-65(9th Cir. 2000)**.

**DISCUSSION**

The Supreme Court has set forth three types of claims that may
be brought against the government under the Due Process clause of the
Fourteenth Amendment.The first clause incorporates many of the spec-
ific protections defined in the Bill of Rights "A plaintiff may bring
suit for an officials violation of his rights to freedom of speech,
unreasonable search and seizure..." **Zinermon v. Burch,494 U.S. 113
125, 110 S. Ct. 975.983,108 L.Ed. 2d 100 (1990)**.Second,the Due Pro-
cess clause contains a "guarantee of fair procedure". **ID.** In procedural
due process claims,the deprivation of a constitutionally guaranteed and
protected interest in "life,liberty,or property,is not in itself uncon-
stitutional; what is unconstitutional is the deprivation of such an
interest without due process of law". **ID. (citing Parrat v. Taylor,451
U.S. 527,537,101 S. Ct.1908.1913, 68 L.Ed 2d 420(1981);Carey v. Piphus
435 U.S. 247,259, 98 S.Ct. 1042,1950,55 L Ed. 2d. 252(1978)**.In such

circumstances,the constitutional violation is not complete until the government fails to provide due process. A third type of constitutional protection is substantive due process.The substantive component of the due process clause bars certain arbitrary,wrongful government actions " regardless of the fairness of the methods used to implement them". **Daniels v. Williams,474 U.S. 327,331 106 S.Ct. 662, 665, 88 L.Ed.2d.** 662(1986).The right to be free from arbitrary actions is a substantive due process right that arises directly from the Constitution.**Regents of University of Michigan v. Ewing, 474 U.S.214, 229-230,106 S.Ct.507,** 515 88 L.Ed. 2d 523(1985). As to this type of claim,the constitutional violation is complete when the wrongful action is taken,regardless of whether or not post deprivationremedies have been put into place.**Dan- iels v. Williams, Supra.; Weller v. Department of Social Services,901 F. 2d. 387,391(4th Cir. 1990); Gilmore v. City of Atlanta,774 F. 2d 1495, 1500 (11th Cir. 1985)(en banc), cert. denied, 476 US 1115, 106 SCt 1970, 90 LEd2d 654 (1986))**"there are no precise standards for de- termining what governmental actions are proscribed by substantive due process.")

Plaintiff relies on the substantive component of due process. "Each new claim to [substantive due process] must be considered against a background of constitutional purpose, as they have been rationally perceived and historically developed." **Regents of Univer- sity of Michigan v. Ewing,** supra. The due process clause in and of itself confers a liberty interest in freedom from government actions that are arbitrary, capricious, and a abuse of discretion or not in accordance with law, and while certain elements of the above have been immunized from judicial scrutiny under the Administrative Pro-

= 6 =

cedures Act, this court may consider whether the agency has acted outside its statutory limits or has violated the Constitution. 5 USC § 706(2)(A); **Wallace v. Christensen,** 802 F2d 1539 (9th Cir. 1986)(en banc).

In the case at bar each and every action taken by Community Corrections Center personnel and leading inexorably towards Plaintiff's violation may be considered arbitrary, capricious, unfounded in both administrative and federal law and in direct conflagration with the 14th Amendment and its guarantee of due process.

Had a proper perusal of the medical log been initialed by medical personnel rather than security/administrative personnel, Petitioner's prescriptions would have been immediately validated, nipping this justiciable controversy in the bud, instead of permitting its poisonous fruit to flourish. Had CCC assistant director Gambala been less concerned with his rush to judgment and afforded Petitioner his constitutionally guaranteed right to present evidence of his innocence, the incontrovertible and undisputable nature of that evidence may have sobered his indiscriminatory abuse of discretion and caused him to rule on the evidence rather than to merely find enough damning evidence to pass it along to the disciplinary hearing officer with a recommendation to violate. Finally had Petitioner been afforded a hearing before the "DHO" as is his ironclad constitutional right, the indisputable nature of the evidence tendered would have, Plaintiff avers, been dispositive. "The Constitution requires a hearing before the government may deprive a person of liberty or property. **Zinermon v. Bush,** 404 US 113, 127, 110 SCt 975, 108 LEd2d 100 (1990).

= 7 =

## CONCLUSION

Plaintiff was deemed in violation of the conditions of his
"release" by one arm of the Bureau of Prisons for taking a prescribed
non-narcotic medication issued to him by a different arm of that same
Bureau of Prisons. Plaintiff claims herein that had assistant director
Gambala and other unknown members of the CCC staff acted in accordance
with Plaintiff's constitutional rights and not in an arbitrary and
capricious manner, that the evidence tendered would have proved dis-
positive in nature and shown his actual innocence. Indeed, the
words of another branch of our government, the Food and Drug Admini-
stration (FDA) seem fitting at this juncture:

> "The FDA requires all federally certified labs to
> include a statement on all dilute test results reflecting
> the need for a medical review of all dilute specimens to
> account for alternative explanations for a dilute test,
> and when the results of a test may be viewed as a breach
> of duty resulting in a loss of privileges there may exist
> a constitutional duty of due process requiring a Medical
> Review.
> If during that review process a medical diagnoses or
> legally obtained prescription for medication requiring or
> affecting ingestion of fluids is verified the dilution
> found in the specimen is to be seen as valid and necessary
> and no adverse action should be taken."

At every turn within the Bureau of Prisons Petitioner has been
thwarted, with no opportunity to present what he considers evidence
dispositive in nature. He has exhausted the Administrative Remedy pro-
cess and now turns to this court for relief. Petitioner seeks a forum
for his evidence and an immediate transfer back to community correc-
tions and/or home confinement and credit for elapsed time during his
stay at Lompoc, and any other relief this court deems just and proper.

Respectfully submitted,

= 8 =

**U.S. Department of Justice**

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

| From: Sandhu, Harman | 17008-097 | A | FCI LOMPOC |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL** Concomitant to an incident report and attendant disciplinary proceedings, I Had my commu correction privelages, including my home confinement revoked, and I was returned to a more secure federal correctiona institution with an increase in my custody classification. I was also stripped of 75 % of my yearly accrued good con time I herein aver my actual innocence and offer the following statement and corroborative documentation in support thereof.

Prior to my urine submission, I voiced concern to my doctor concerning my excessive thirst and urination, to which my doctor instructed me to increase my fluid intake to prevent dehydration and possible kidney damage. The Same physician prescribed me Naproxen after the halfway house misplaced my prescription I had arrived with from Lompoc.

On February 22, at approximately 8:30 I arrived after work to the halfway house to provide an urine analysis. After noticing the clear appearance, I expressed concern to Director Gambala, who displayed marked indifference, telling me merely to "reduce my fluid intake." Director Gambala was unaware of my prescription or medical instructions that I was under.

On February 25, I was told of my diluted Urine analysis and told to return to the halfway house. A cursory and erroneous check of the medical prescription log by non-qualified security staff led to the opinion that I was not taking any medication that would result in a diluted sample, and therefore issued an incident report. I in fact was taking prescribed medication, which had been reported upon my arrival, and then misplaced by staff as mentioned above.( please see attached documents)

I then offered to submit hair samples, which are commonly considered prima facie forensic evidence of guilt or innocence, which was erroneously dismissed as "time elapsed" by Dan Painter of the Sacramento BOP office after a mere six days, a claim entirely refuted by any reputable and federally-certified laboratory,which use a 90 day window before a given sample is rendered invalid. (Please see included documentary evidence.)

**(continued on attached)**

| 5/09/11 | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

| DATE | REGIONAL DIRECTOR |
|---|---|

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 637780-R2

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: _____

Sandhu, Harman - Fed. Reg. No. 17008-097 - A Unit - FCI Lompoc - ADMINISTRATIVE REMEDY APPEAL:  CONTINUED

This rush to judgement continued with a CDC hearing on or about the 27th of February, at which Director Mark Gambala, once again refused to acknowledge the correlation between my medication  Naproxen and a diluted urine sample. A statement so falacious and contrary to all medical and scientific evidence that it must impugn the integrity of the proceeding if not the individual.

      Given these antecedants, and the fact that I was denied adequatettme to provide the proper documents, it is no surprise that my final disciplinary hearing before the DHO resulted in me being found guilty of the charged offense. I was taken back into custody and had to wait until being provided the DHO report on March 18th before filing an appeal.

      The enclosed documentation  its organization and coherent presentation have now become available and considering irrefutable documentation is essential, I am requesting my case be reviewed and reexamined  It is  in fact irrefutable that I, contrary to the initial report, was indeed taking prescribed medicine at the time of my testing that would have led to a diluted sample. (Please see enclosed corroborative evidentiary exhibits.) A comprehensive medical review of the prescription log, rather than a cursory check by security personnel, would have made this abundantly clear and prevented this turn of events from taking place.

      It is likewise irrefutable that the prescribed medication ingested by me had an adverse effect of "excessive thirst," and "excessive urination" which necessarily increases fluid intake  including the instructions of my physician which can then lead to a diluted urine sample.  This has been established by any number of professional manuals, medical schools, and perhaps most importantly, federally certified labs and government sponsered websites,in stark contrast and contrary to the CDC findings that no correlatiye relationship exists between my medication and diluted samples.  (please see corroborative evidentiary exhibits.)

      Furthermore, Susan  Ramsden owner and operator of Comprehensive Medical Inc (CMI), a federally regulated and approved drug testing facility, states in her attached declaration that :

      "FDA requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test, and when the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring a Medical Review.

      If during that review process a medical diagnoses or legally obtained prescription for medication requiring or effecting ingestion of fluids is verified the dilution found in the specimen is <u>to be seen as valid and necessary and no adverse action should be taken.</u>"

I aver that the above instances constitute 'plain error' and warrant a reversal in and of themselves.

      Had the disciplinary process been continued pending documentary evidence, had hair samples been tendered as I had offered and still offer (the 90 day window of validity is still open)as a means of authenticating my innocence  had any number of checks and balances been administered by qualified medical personnel, this rush to judgment would have been stopped in its tracks.  As it stands, in the light of the documented evidence made part of this appeal, I now feel that the greater weight of the evidence now tends to exonerate rather than implicate and I am requesting an immediate reversal of sanctions, including restoration of my good conduct time, restoration of time earned through my successful completion of the Residential Drug Program (RDAP) and a prompt release from incarceration.

                                        Respectfully Submitted,


                                        Harman Sandhu

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: __W. Sandhu, Harman__    __17008-097__    ___A___    ___For Lompoc___
       LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.           UNIT          INSTITUTION

**Part A—REASON FOR APPEAL.** Although a detailed exposition and analysis of the incident in question together with its repercussions is enclosed as my BP10, a reiteration of certain indisputable facts seems essential here. In order that the heart of the avenue as they conceived may avoid the size of the argumentation that surround its periphery, and also to take note of the utter falsolousness of the finding however. The following facts are disclosed by the recent either the record of the instant incident, or Sandhu's comprehensive BOP file provided to the officials in question.
1. While at the Federal Prison Camp located at Lompoc, California, where he was successfully completing the 500 hour Drug Awareness Program immediately returning to taking the incredibly painful Naproxen on a regular basis to combat pain, as prescribed by prison health officials. Upon completing the program and his transfer to home confinement, Sandhu left prison camp and "Naproxen" left with him as dictated by the medical staff. 2. As his discretionary time increased, Sandhu began exercising again and with that exercise came the return of pain. Sandhu then went to a private physician and had his original BOP authorised Naproxen prescription renewed. The taking of medication to relieve back pain in this case documented by the BOP, is as inculcated across all strata of society as eating, including federally funded drug awareness programs. 3. Previous to his test the BOP had recently instituted a new policy where a diluted urine would now be considered analogous to a "refusal to submit" a urine sample with the same sanctions applicable. 4. On February 22, 2011 Sandhu provided his randomly scheduled urine test. Three days later this test returned a diluted result and Sandhu was told to return to the halfway house where the events detailed in his BP10 unfolded. 5. It is an established fact and well documented by any number of physicians, medical manuals, medical schools, and perhaps most importantly (literally certified testing laboratories that the chief side effect of Naproxen of excessive thirst and the consequent increased fluid intake and urination. The CDC (Central Discipline Committee) finding that no correlation exists between the two flys in the face of all accepted medical and scientific literature. 6. The Federal Drug Administration (FDA) requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test, and when the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring

                                    Medical Review.

_____       (continued on attached)       _____
         DATE                                                  SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____                                      _____
         DATE                                                  GENERAL COUNSEL

**FIRST COPY: WASHINGTON FILE COPY**                   CASE NUMBER: _____

**Part C—RECEIPT**                                      CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____                        _____
         DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                          Previously BP-DIR-11                        BP-231(13)
                                                                            APRIL 1982

637780-R2
FCC Lompoc

You are requesting administrative relief regarding the decision of the Center Discipline
Committee (CDC) on February 28, 2011, which was certified by the Discipline Hearing Officer
(DHO) on March 3, 2011, in which you were found to have committed the prohibited act of
Refusing to Provide a Urine Specimen for Drug Testing, Code 110, while at the Cornell
Companies Inc., Oakland Center, CA. You make various claims which have been addressed
below. For relief, you ask to be exonerated of the charge, your sanctions and privileges be
reversed.

On appeal, the appropriate reviewing authority shall consider: (a.) Whether the UDC or DHO
substantially complied with the regulations on inmate discipline; (b.) Whether the UDC or DHO
based its decision on some facts, and if there was conflicting evidence, whether the decision was
based on the greater weight of the evidence; (c.) Whether an appropriate sanction was imposed
according to the severity level of the prohibited act; and (d.) other relevant circumstances.

A review of the disciplinary action indicated that you were provided due process as required by
Program Statement 7300.09, Community Corrections Manual. You were given advance written
notice of the charge against you prior to the hearing before the CDC. You were afforded an
opportunity to request a staff representative and witnesses. You waived both these rights. You
were provided a CDC hearing at which you were provided an opportunity to make a statement to
the CDC and to present documentary evidence on your behalf. Your statement is reflected in the
record and addressed by the CDC. There is no indication in the record that you presented
documentary evidence.

The CDC detailed in the report the basis for finding that you committed the prohibited act. You
were sanctioned by the DHO in accordance with policy.

You claim that you are innocent. Bureau of Prisons policy directs the CDC to consider all
evidence presented at the hearing and shall make a decision based on some facts, and if there is
conflicting evidence, it must be based on the greater weight of the evidence. Though you deny
the charge, it is apparent that the CDC found you guilty based on the greater weight of evidence.
Evidence weighed against you included the statement of the reporting officer and the
documentary evidence included in the record.

You claim that the diluted specimen was caused by the side effects of your prescribed medication
(Naproxen). The purpose of the urine surveillance program is to detect and deter drug use by
inmates. Acts that circumvent the accurate testing and reporting of drug use adversely affects
staff's ability to provide a safe environment for residents. Whether intentional or not, your
provision of a diluted urine specimen interfered with the orderly running of the institution.

In your appeal you claim you were not afforded the opportunity to present evidence in your
defense. The record indicates you did not present evidence at the time of your in-person
hearing. Inmates are afforded the opportunity to present evidence at the UDC, DHO or CDC
hearing, not during the appeal process. This is not the forum to request such action.

637780-R2
FCC Lompoc

We find that staff afforded you the appropriate due process protections for inmate discipline
actions and that staff met the evidentiary standard required for finding that you committed the
prohibited act.    Therefore, any request for relief from this discipline action or sanctions is
denied.

If dissatisfied with this response, you may appeal to the Office of the General Counsel, Bureau of
Prisons, 320 First Street, NW, Washington, D.C., 20534.    Your appeal must be received in the
General Counsel's Office within 30 calendar days of the date of this response.


_6/7/11_
DATE

ROBERT E. MCFADDEN, Regional Director

Sandhu, Harman      17008-097                                    Page 2 of 2

If during that review process a medical diagnoses or legally obtained prescription for medication requiring or effecting ingestion of fluids is verified the dilution found in the specimen is <u>to be seen as valid and necessary and no adverse action should be taken."</u>

It seems to be even clearer than my urine sample that the half way houses zeal to enforce its new dilution policy blinded their eyes to the complete legitimacy of my actions. Their heavyhandedness is apparent through all phases of their procedure; from their initial cursory check of their medical logs and the conclusion that I was not taking <u>any</u> medication, to their refusal to accept hair samples as "time elapsed" when they were anything but to their "no correlation" decision made by non medical personnel where literally reams of correlation exist.

The Regional response basically says that whether I am taking prescribed medicine or not my handing in a diluted sample interfered with the orderly running of th institution. How can this be? Does the taking of certain medication originally prescribed by BOP physicians interfere with the orderly running of the institution? If not how can a urine sample that bespeaks that medication violate BOP policy.

Inmate Sandhu understands that within an incarceration mileau further particularized by both general urine sampling and the inmate's specific DAP requirements that a strict policy need be adhered to and enforced. Yet it was the need to establish illigitimacy that led to the FDA's statement concerning alternate explanations concerning dilute tests and the constitutional duty of due process.

Inmate avers that the use of this prescribed medicine was wholly legitimate across all phases of the process and that a reasonable trier of fact could come to no other conclusion. In light of that inmate asks that all sanctions be immediately removed, all time spent under sanction be credited towards his home confinement and that he be immediately released to any home confinement term that may remain.

                                        Respectfully submitted,

Section 5
SANDHU Harman
Reg. No. 17008-097
The CDC reviewed your investigative paperwork and reflected that you
SANDHU, Harman Reg. No. 17008-097 received a copy of the charges against
you, were read your rights, waived your 24 hour notice, and requested no staff
representatives, and no witnesses. The CDC finds that you, SANDHU, Harman
Reg. No. 17008-097 committed the prohibited act of BOP Code: CODE 110
Refusing to provide a urine sample or to take part in other drug-abuse testing.
The CDC considered the written account of the reporting staff member which
states the following:

On January 22, 2011, at approximately 1500 hours. I. Marion Brisco, Chief or
Security received information from Redwood Toxicology Laboratory that
indicated Chain of Custody specimen number 110280 was confirmed Dilute for
creatinine. After a verification of FEBRUARY 2011 urinalysis log, chain of
custody number 110280 was submitted by Pre-Release client SANDHU Harman
Reg. No. 17008-097. Mr. Sandhu was tested on February, 22 2011 at 2040 hours by
F. Adenyi Monitor I. A review of the GEO CARES inc medication log reflected
that Mr. Sandhu, Harman was not taking prescription medication that would
result in a DILUTED sample at the time the test was administered.

Based on the above facts, Mr. Sandhu Harman Reg. No. 17008-097 is being cited
for BOP Code 110 Refusing to provide a urine sample or to take part in other
drug-abuse testing

The CDC considered the fact that you exercised your right to appear before the
CDC. The CDC took into account your statements regarding a new NAPROXEN
prescription on 2/3/2011 and reviewed the Medication Policy which states: "All
medications, prescriptions or non-prescriptions are to be turned in to staff at the
time you sign into the facility", which you failed to do while on home
confinement. The CDC took into consideration that your Case Manager has no
record of you going to the Doctor or the Pharmacy. I also took into consideration
that the Redwood Toxicology Laboratory staff specialist indicated that she has no
knowledge of any correlative relationship between the medication Naproxen and
diluted creatinine samples.  The CDC considered the fact that you did not
present any evidence to refute the reporting officer's written account of the
incident I find that the greater weight of the evidence supports the finding that
you, Sandhu, Harman Reg. No. 17008-097 committed the prohibited act of: BOP
Code 110 Refusing to provide a urine sample or to take part in other drug-abuse
testing.

Part III – Investigation | 22. Date And Time Investigation Began 2-27-11

23. Inmate Advised Of Right To Remain Silent: You are advised of your right to remain silent at all stages of the discipline process. Your silence may be used to draw an adverse inference against you at any stage of the discipline process. Your silence alone may not be used to support a finding that you have committed a prohibited act.

The Inmate Was Advised Of The Above Right By _____   At (Date/time) 2/27/11 @ 1151

24. Inmate statement and attitude

On Tuesday (2-22-2011) Sandhu reported in for C/A and reports that Monitor I, Remi A., "failed to ask [him] about meds." Reports that he used the restroom once w/in the 20 minute wait period. Client reports that he was taking Naproxen which side effects include "increased urination" and "increased volume of pale, dilute urine", according to drugs.com. (Client provided print copy).

25. Other facts about the incident, statements of those persons present at scene, disposition of evidence, etc.
prescribed                                                                          MEDICINE
Client has reported he was on Naproxen since his arrival verified through Sect prescription
of case file (consultation/monitor Mtake). Reports he hasn't been taking it    SUBMITTED
until around his approved home confinement date.                               UPON ARRIVAL.
Client will provide verification for prescription during CDC hearing.          NEW PRESCRIP
                                                                               ONLY BECAUSE
                                                                               HALFWAY HO-
                                                                               STAFF "MISPLA
                                                                               THE MEDICINE

26. Investigator's comments and conclusions
Client is to provide prescription at CDC hearing for as evidence

27. Action taken
Refer to CDC

Date and Time Investigation Completed 2-27-2011   1206 hrs

Printed Name/Signature Of Investigator Michel Ekong _____   title CA1II

The Chairman of the Center Discipline Committee will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by him/her to be necessary for an appreciation of the circumstances surrounding the charge(s). Repetitive witnesses need not be called. Unavailable witnesses may be asked to submit written statements.

Date, sign, and return this form to the Chairman of the Center Discipline Committee.

| Date | Inmate Signature/Reg. No. |
|---|---|
| 2/27/11 | 19808-097 |

| Notice of hearing given to inmate by  Employee Signature | Date |
|---|---|
| | 2-27-2011 |

This form may be replicated via WP.

This form was adapted and used by the Federal form line.

## WAIVER OF 24 HOUR NOTICE

I have been advised that I have the right to have a written copy of the charge(s) against me at least 24 hours prior to appearing before the Center Discipline Committee. I wish to waive this right and proceed with the Center Discipline Committee hearing at this time.

| Signed by Inmate | Inmate Typed or Printed Name | Register No. |
|---|---|---|
|  | HARMAN SANDHU | 17008-097 |
| Date and Time Inmate Signed | Witnessed by (Employee Signature) | |
| 2/27/11  1214 | | |

This form may be replicated via WP:

U.S. Department of Justice
Federal Bureau of Prisons

**Incident Report**
**Attachment Q**

# Discipline Report CSC 9WM

Page 1

| Name of Inmate: | Register Number: | Hearing Date | Hearing Time |
|---|---|---|---|
| Sandhu Harman | 17008-097 | 2/28/2011 | 2050 hours |

| Date of Incident: | Date of Incident Report: | Prohibited Act(s) Code |
|---|---|---|
| 2/22/2011 | 2/25/2011 | 110 |

Refusing to provide a urine sample or to take part in other drug-abuse testing

| Notice of Charge(s) | Date: 3-3-11 | DHO Name (Printed/Signature) RANDY MCWILLIAMS/ [signature] |
|---|---|---|

| | Date | Time | By |
|---|---|---|---|
| Advance Written Notice of charges: | 2/25/2011 | 1715 hrs. | Marlon Brisco Chief of Security |
| The CDC Hearing was held on: | 2/28/2011 | 2050 hrs. | Mark Gambala Assist Facility Director |
| The inmate was advised of his rights: | 2/27/2011 | 1214 hrs. | Michel Khem Case Manager II |

II Staff Representative

| Yes | No | NA | |
|---|---|---|---|
| X | | | Inmate waived right to staff representative |
| | X | | Staff declined or could not appear but the inmate was advised of option to postpone hearing to obtain another staff representative with the result that |

A. Inmate has been advised of his right to present a statement or to remain silent, to present documents, including written statements of unavailable witnesses, and for relevant and material witnesses to appear in his behalf at the hearing.

| | Admits | Denies |
|---|---|---|
| Inmate admits/denies charge(s) | | X |

B. Summary of Inmate Statement **I am innocent, the medication I am taking (NAPROXEN) has side effects, which include increased urination and increased volume of pale dilute urine.**

| C. Witnesses: **NA** | Yes | No |
|---|---|---|
| 1. The inmate requested Witnesses | **NA** | |
| 2. The following Persons were called as witnesses at this hearing and appeared: | NA | |
| 3. Summary of testimony of each is attached? | **NA** | |
| 4. The following persons requested were not called for the reason(s) given: | | |

[ ... on 4/18/2011 Inmate given ... packet
4/18/11 ... (Casemanager) ... ]

- Inmate

UNABLE TO FILE UNTIL 4/18 DUE TO LACK OF DISCIPLINARY REPORT. RECEIVED 4/18/11

Page 2

| 5. Unavailable witnesses were requested to submit written statements and those statements were considered? | NA |
|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the Committee considered the following documents.

| E. Confidential Information was considered by the CDC and not provided to inmate | | X |
|---|---|---|

**IV. Finding of the Committee**

| X | a. The act was committed as charged. |
|---|---|
| | b. The following act was committed: |
| | c. No prohibited act was committed: Expunge according to your Statement of Work. |

**V. Specific Evidence Relied On To Support Findings**

**See Attached**

**VI. Sanction Recommendation**

Sanctions
1. **Suspended Disciplinary Transfer**
2. **Revocation of Home Confinement**
3. **Forfeit 75% Good Conduct Time**

**VII. Reason for Sanction Recommendation**

This type of action is a serious offense, which disrupts individual programming and jeopardizes the security of the reentry center. A suspended Disciplinary Transfer, Revocation of Home Confinement and forfeit of 75% of good conduct time will hopefully deter this type of action in the future.

**VIII. Appeal Rights**

The inmate has been advised of the findings; specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal under the Administrative Remedy Procedure or by letter within 20 days of the imposition of the sanction to the Regional Director. A copy of this report will be sent to the inmate.

**IX. Discipline Committee**

| Chairperson | Member | Member09 |
|---|---|---|
| **Mark Gambala** | | |

**X. Action by DHO**

TRANSFER.
DISALLOWED 40 HRS GCT.

| DHO Name (Typed and Signature) | Date |
|---|---|
| RANDY mcwilliams | 3-3-?? |

 REDWOOD TOXICOLOGY LABORATORY

**Federal Bureau of Prisons** 

| | |
|---|---|
| **CLIENT'S NAME AND ADDRESS:** | **SPECIMEN NUMBER:** 110280 |
| Oakland Center (16A) - Client 205 MacArthur Blvd Oakland, CA 94606 | **ACCOUNT NUMBER:** 5994 |
| | **SPECIAL TESTS REQUESTED:** |

INSTITUTION CODE: CIWM

**INSTITUTION SECURITY LEVEL:**  ☒ Administrative

1. To the extent possible, urine samples should be collected in one or two centralized areas of the institution, e.g. Lieutenant's office or S & P the staff who are thoroughly familiar with the procedures specified below.

2. Inmates shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample. Prior to collecting the sample, a staff member shall complete all blocks of the Chain of Custody form **except** for Time Provided and Collector and Inmate Certification.

3. When the inmate reports for testing staff shall make a positive picture identification of the inmate, shall collect a specimen from the inmate under direct observation, shall complete time provided information, shall ensure that the specimen bottle is tightly capped and shall affix a label containing the specimen number to the Urine Surveillance Log. Ordinarily, to be submitted for testing, bottles should be full.

4. The inmate shall verify that the specimen numbers (i.e. barcode numbers) on the Chain of Custody form, on the peel-off barcode, and on the numbered label to be affixed to the Urine Surveillance Log are identical.

5. After verification, the collector shall affix the barcode and security seals to the specimen bottle. The inmate shall be asked to initial the security seal and to read and sign the Inmate Certification Statement.

6. The staff member collecting the specimen shall read and sign the Collector Certification Statement. If the inmate refuses to sign the Inmate Certification or initial the security seal, a second staff member shall also sign the Collector Certification and shall initial the security seal.

7. After samples are collected, they shall be maintained under direct staff observation until moved to a locked area where they may be stored until mailing. This area shall be designated by the Urine Surveillance Program Coordinator and should be one which is accessible to a very limited number of staff and to no inmates.

8. All samples shall be sent to Redwood Toxicology Laboratory no later than the first work day after they are collected.

9. When a positive result is received, an incident report shall be written unless medical staff indicates a positive result is due to authorized medication. A photocopy of both the laboratory report and the Chain of Custody form retained at the institution containing the inmate's name, registration number and specimen number shall be attached to the incident report and made part of the disciplinary record.

**TEST REASON:** ☐ 01 – Random  ☐ 02 – Suspect  ☐ 03 – Community  ☐ 11 – Terminate Drug  ☐ 16 – Mandatory Urine Testing  ☐ 9 – PHP Pre-Use

**INMATE NAME:** Sandy Harman    **REGISTER #:** 17808-097

**DATE COLLECTED:** 2/22/11    **TIME REQUESTED:** 1035    **TIME PROVIDED:** 2040

**COLLECTOR CERTIFICATION:** I certify that the specimen identified on the form is the specimen presented to me by the inmate showing the particular on below, that it was sealed in his/her presence as set forth above, and that the specimen bottle was sealed in my presence and that the information on its form and above is correct.

Collector's Printed Name    Collector's Signature

**INMATE CERTIFICATION:** I certify that the specimen accompanying this form is my own and that I provided it to the collector. Further, I verify that the specimen was sealed in my presence and that the information on this form and above is correct.

Second Witness Signature    Inmate's (Donor's) Signature





## RECORD OF URINE TESTING

| | | |
|---|---|---|
| | MONTH OF: | Febuary |
| RESIDENT NAME: | Sandhu, Harman | REG #: 17008 - 097 |
| ARRIVAL DATE: | 10/19/2010 | RELEASE DATE: 4/8/2011 |
| STATUS: | DCC    PL    SP    PR    PT | |
| RISK CATEGORY: | AFTERCARE    > | RANDOM |

CHAIN OF CUSTODY FORM TO USE:

_____X_____ BOP          _____ PROBATION          _____ PRE-TRIAL

| Staff Intls PAT DOWN | BAR CODE: Chain of Custody Form | DATE: | TIME: | STAFF: | RESULTS (w/o) DATE RECEIVED |
|---|---|---|---|---|---|
| 𝘏𝘉 | 110784 | 2/5/11 | 1230 | 𝘏𝘉 | Neca  4/5/11 |
| 𝘫 | 110891 | 2/11 | 1200 | 𝘫 | |
| 𝘏𝘉 | 110170 | 2/5/11 | 1211 | 𝘏𝘉 | Neca  5/4/11 |
| 𝘗𝘛 | 110280 | 2/21/11 | 0810 | 𝘊𝘏 | |
| | | | | | |
| | | | | | |



REDWOOD
TOXICOLOGY
LABORATORY

3850 Westwind Blvd  Santa Rosa  CA 93403
Phone 707 577-7950 / 800 255-2150
Fax  707 577-7366
www.redwoodtoxicology.com

Oakland Center (106) - Client
205 MacArthur Blvd
Oakland, CA 94610



| | |
|---|---|
| ACCOUNT NUMBER | ACCESSION NUMBER |
| 60064 | 110224-12426 |

IDENTIFICATION
110280 Req# 110280

ORDERED BY
Oakland Center (106) - Client

NOTES

COLLECTED
2/22/2011

| RECEIVED | REPORTED |
|---|---|
| 2/24/2011 | 2/25/2011 |

| POSITIVES | TEST | RESULT |
|---|---|---|
| | Creatinine<br>Specimen is dilute | 12.6 mg/dL |
| | Opiates | None Detected |
| | Benzodiazepines | None Detected |
| | Barbiturates | None Detected |
| | Methadone | None Detected |
| | Phencyclidine (PCP) | None Detected |
| | Cocaine (Benzoylecgonine) | None Detected |
| | THC (Marijuana)<br>EIA cutoff level is 20 ng/ml. | None Detected |
| | Amphetamines | None Detected |

NOTE:

The results for this specimen have been tested in accordance with all Redwood Toxicology Laboratory standard operating procedures and have been reviewed by laboratory certifying scientists.

Chief Toxicologist: Wayne Ross, M.C.L.S.

110224-12426      2/25/2011 2:58:06 PM

Laboratory Directors:
Mark J. DeMeo  M.D.
Richard R. Wilbor, M.D.

Specimen disposition  Specimens will be disposed as follows. Negatives  Destroyed within 2 days. Positives destroyed within 6 months  all medico-legal maintenance areas after 2 months



REDWOOD
TOXICOLOGY
LABORATORY

3650 Westwind Blvd. Santa Rosa CA 95403
Phone: 707-577-7950 / 800-785-2155
Fax 707-577-7955
www.redwoodtoxicology.com

Oakland Center (106) - Client
205 MacArthur Blvd
Oakland, CA 94610



| ACCOUNT NUMBER | ACCESSION NUMBER |
|---|---|
| 60064 | 110224-12426 |

| IDENTIFICATION |
|---|
| 110280 Req# 110280 |

| ORDERED BY |
|---|
| Oakland Center (106) - Client |

| NOTES |
|---|
| |

| COLLECTED |
|---|
| 2/22/2011 |

| RECEIVED | REPORTED |
|---|---|
| 2/24/2011 | 2/25/2011 |

| POSITIVES | TEST | RESULT |
|---|---|---|
| | Creatinine Specimen is dilute | 12.6 mg/dL |
| | Opiates | None Detected |
| | Benzodiazepines | None Detected |
| | Barbiturates | None Detected |
| | Methadone | None Detected |
| | Phencyclidine (PCP) | None Detected |
| | Cocaine (Benzoylecgonine) | None Detected |
| | THC (Marijuana) EIA cutoff level is 20 ng/ml. | None Detected |
| | Amphetamines | None Detected |

NOTE:

The results for this specimen have been tested in accordance with all Redwood Toxicology Laboratory standard operating procedures and have been reviewed by laboratory certifying scientists.

Chief Toxicologist. Wayne Ross, M.C.L.S.

110224-12426      2/25/2011 2:38:08 PM

Laboratory Directors:
Mark J. DeMeo M.D
Richard R. Wilber, M.D

Specimen disposition: Specimens may be disposed, as follows: negatives, delivered within 2 days. For level cautioned after 6 months, all methadone maintenance urines after 2 months.

BP-S205.073  INCIDENT REPORT (CCC S) CDFRM
AUG 99

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

1. Name of CCC: Cornell Companies Inc. - Oakland Center
Part 1 - Incident Report

| 2. Name of Offender: Sandhu Harman | 3. Register Number: 17008-097 | 4. Date of Incident: 02/20/2011 | 5. Time: 1040 hrs |
|---|---|---|---|
| 6. Place of Incident:Cornell Companies-Oakland Center | 7. Component: | 8. Type of Offender: Pre-Release | |

8. Incident: CODE 110 Refusing to provide a urine sample or to take part in other drug-abuse testing

Description of Incident  Date: 1 22 2011 Time: 1100 hrs staff became aware of the incident)

On January 22, 2011, at approximately 1500 hours, I, Marlon Brisno, Chief of Security received information from Redwood Toxicology Laboratory that indicated Chain of Custody specimen number 110280 was confirmed Dilute for creatinine. After a verification of FEBRUARY 2011 urinalysis log, chain of custody number 110280 was submitted by Pre-Release client SANDHU Harman Reg. No. 17008-097. Mr. Sandhu was tested on February, 20 2011 at 1040 hours by F. Adenyi Monitor I. A review of the GEO CARES Inc medication log reflected that Mr. Sandhu, Harman was not taking prescription medication that would result in a DILUTED sample at the time the test was administered.

Based on the above facts, Mr. Sandhu Harman Reg. No. 17008-097 is being cited for BOP Code 110 Refusing to provide a urine sample or to take part in other drug-abuse testing

| 11.Signature of Reporting Employee | Date & Time: 1/23/2011 1500 hrs | 13. Name & Title (Printed): Marlon Brisno Chief of Security |
|---|---|---|
| 14 Incident Report Delivered to Above Offender By: mmbdeli. | | 15. Date Incident: 2-25/11  16. Time Incident Report Delivered: 1715 |

Record Copy - Central File Record; Copy - DHO; Copy - Inmate After CCC Actions; Copy - Inmate Within 24 Hours Of Part 1 Preparation.

(This Form May Be Replicated Via WP)              Replaces BP-205 (07) of OCT 94

BP-A0606.072  INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RDC'S)  CDFRM
MAR 94
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

GEO CARE INCORPORATED - OAKLAND CENTER
Facility

As an inmate charged with a violation of Center rules or regulations referred to the Discipline
Committee for disposition, you have the following rights:

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to
   appearing before the Center Discipline Committee;

2. The right to have a member of the staff who is reasonably available represent you before the
   Center Discipline Committee;

3. The right to call witnesses and present documentary evidence in your behalf, provided Center
   safety would not be jeopardized;

4. The right to remain silent. Your silence may be used to draw an adverse inference against
   you. However, your silence alone may not be used to support a finding that you committed
   a prohibited act;

5. The right to be present throughout the Center Discipline Committee hearing except during
   Committee deliberations and except where Center safety would be jeopardized;

6. The right to be advised of the Center Discipline Committee recommendation and Bureau of
   Prisons' decision, the facts supporting the recommendation and decision, except where Center
   safety would be jeopardized, and the disposition in writing; and,

7. The right to contest under Administrative Remedy procedures, or by letter the Bureau of
   Prisons' designee to the Regional Director within 20 days of notice of the decision and
   disposition.

I hereby acknowledge that I have been advised of the above rights afforded me at a Center Discipline
Committee hearing.

Signed: _____  Reg. No.: 13708-097  Date: 2/22/11

Notice of rights given to inmate on 2-27-11  by _____
                                      Date              Employee Signature

**INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RDC's)**

Facility

When an inmate has been advised of the rights afforded at a Center Discipline hearing  but refuses
to sign the Acknowledgment, the following should be completed.

I have personally advised _____ of the above rights afforded
                              Inmate's name and Register No.
at a Center Discipline Committee hearing  however, the inmate refused to sign the acknowledgment.

Signed: _____

_____
(Employee's Print Name)

_____
(Date)

BP-A207.075
MAR. 1994

**NOTICE OF CENTER DISCIPLINE COMMITTEE**
**HEARING (CCC'S)**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

Date

2-27-2011

Facility

GEO CARE INCORPORATED - OAKLAND CENTER

Inmate

Ho Sandhu, Harman

Register Number

17008-097

Alleged Violation(s):

Refusing to provide a urine sample or to take part in other drug-abuse testing

Date of Offense

2-22-11

Code Number

110

You are being referred to the Center Discipline Committee for the above charges(s):

The hearing will be held on: 2-24-11 , at: 2050 ,

at the following location: GEO CARE OAKLAND center

You are entitled to have a staff member represent you at the hearing. Please indicate below whether you desire to have a staff representative, and if so his or her name.

Inmate's initials _____ ____ (do) wish to have a staff representative.

Inmate's initials HS ____ X (do not) wish to have a staff representative.

If so, the staff representative's name is

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf, provided calling your witnesses will not jeopardize Center safety. Names of witnesses you wish to call should be listed below.
Inmate's initials HS HS Briefly state what each proposed witness would be able to testify to:

Name N/A                                                   Can Testify to:

Name N/A                                                   Can Testify to:

Name N/A                                                   Can Testify to:

March 17, 2011

Baljit S. Gill, M.D.
251 Shrike Circle
Sacramento, CA 95834
(530) 682-1378
CA license No: A113101
DEA No: FG2108391

To Whom It May Concern:

I am writing this letter on behalf of Mr. Harman Sandhu regarding his recent placement in custody.  I am a
Physician specialized in the field of Internal Medicine and currently working as an Internal Medicine
Hospitalist in Oroville, CA.  I am well aware of Mr. Sandhu's current predicament and hope that I could
shed some light on side effects of a certain medication that was prescribed by myself to Mr. Sandhu.

Mr. Sandhu has been under my care and treatment for tendonitis of his knees.  In addition to rest, he was
prescribed a Non-Steroidal Anti-inflammatory drug (NSAID) called Naproxen.  This class of medications
is considered first-line treatment in tendonitis.

Shortly after beginning course of treatment, Mr. Sandhu expressed to me that he indeed was experiencing
excessive thirst and urination.  He was instructed to increase his fluid intake in order to avoid dehydration.
In my experience, what Mr. Sandhu was experiencing is a well-known and established adverse effect of
taking NSAIDs.  He was experiencing excessive thirst caused by Naproxen use.  I strongly believe that
this increase in fluid intake is what caused Mr. Sandhu to have a dilute urine sample and was simply a result
of a side effect of a common medication.  Mr. Sandhu was given medical advice to increase his fluid
consumption in order to combat the excessive thirst and to avoid more serious complications associated
with Naproxen use such as kidney dysfunction and damage.  I have seen many other patients with similar
complaints in my practice and give similar advice to them.

Excessive thirst is a side effect of naproxen and other NSAIDs that is well documented in medical literature.
It can also cause deleterious effects on kidney function, and as a result, common for patients to be told to
maintain adequate hydration while taking this medication, as was Mr. Sandhu.  I have enclosed
information from professional health care and National Institute of Health- backed websites for patients that
clearly list these as adverse effects of naproxen use.

It is also well established that increasing fluid intake can lead to excessively dilute urine.  In my
professional experience, it is quite certain that Mr. Sandhu had a dilute urine sample because of a side effect
he experienced as a result of naproxen use.  I feel without a doubt that Mr. Sandhu's symptoms were due to
established side effects of naproxen, which was prescribed to him for a medical condition.

Please feel free to contact me for any additional questions or clarifications.  I hope this provides
clarification on the situation Mr. Sandhu is facing.  I have enclosed some information from credible
sources on the use and side effects of naproxen for further verification.  Similar information can also be
found in medical textbooks such as Merck Manual.

Thank You,

Baljit S. Gill, M. D



**USC**
UNIVERSITY
OF SOUTHERN
CALIFORNIA

Keck School of Medicine
University of Southern California

Department of Anesthesiology

March 17th, 2011

To Whom It May Concern:

I am writing a letter on behalf of Harman Sandhu regarding his recent custody placement. I am currently a physician in the State of California in the department of Anesthesiology specializing in cardiothoracic anesthesia at University of Southern California.

I am well aware of the nature regarding Mr. Sandhu's situation and am hoping to present evidence including personal experience that will show the following: That the use of non-steroidal anti-inflammatory drugs (NSAIDS) such as naproxen can cause excessive thirst leading to a dilute urine sample. This is a well-known and established side effect. Mr. Sandhu was prescribed naproxen for tendonitis, which is a first line treatment for such pathologies if the pain does not improve with rest.

In my experience I have given NSAIDs to my patients in the operating room for pain control and have noted the change in urine from concentrated yellow to clear color with concurrent administration of intravenous fluids. I am aware of this side effect and have often supplement the patient with fluids in order to prevent dehydration.

There are many studies that clearly state that with the use of naproxen a patient can develop excessive thirst which is a side effect and hence increase fluid intake; which can lead to a dilute urine sample. This is what occurred in Mr. Sandhu's case. In reference, Medline plus a website sponsored by the government clearly states the side effects of naproxen and that includes excessive thirst. I have placed the link below for verification. Further textbooks state (Merck Manual) that dry mouth can be associated with the use of this drug. The Merck Manual is considered the gold standard regarding drugs and their side effects.

In my opinion there is no "gray" zone regarding this being a side effect of naproxen. Many studies and many textbooks including the insert that is provided in the drug by the drug manufacturer clearly states that one of the adverse effects is thirst; hence causing a patient to have increased fluid consumption in turn causing dilute urine. I have provided the link to the insert that is provided with the purchase of the drug below.

Please feel free to contact me regarding any questions. I hope that this information clarifies a situation, which is simply due to a side effect of a medicine that is obtained over the counter; despite this Mr. Sandhu still obtained physician's prescription for this medicine.

1500 San Pablo Street, 4th Floor
Los Angeles, California 90033
Tel: 323-442-8843
Fax: 323-442-8627



**Keck School of Medicine**
University of Southern California

Department of Anesthesiology

Sincerely,

Amardeep Heyer, MD
Cardiothoracic Fellow
aheyer@usc.edu
530-574-1640
Department of Anesthesiology
Keck School of Medicine
University of Southern California

Enclosures: 3
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html
http://www.drugs.com/pro/naproxen-tablets.html

1500 San Pablo Street, 4th Floor
Los Angeles, California 90033
Tel: 323-442-8843
Fax: 323-442-8627



**Comprehensive medical inc**
since 1992

I, Susan Ramsden, declare:

1.      I am a resident of Sacramento County. I make this declaration from my own knowledge. I could and would testify as to the matters contained in this declaration if called to do so.

Dr. Dwight Bass MD

2.      I have owned and operated Comprehensive Medical Inc (CMI) for 19 years. CMI conducts drug and alcohol testing for the Sacramento, Yolo, El Dorado and Placer County criminal and civil courts.

Gerald Roesaler MD

3.      I am a Forensic Toxicology Analyst and a Juris Doctor. Every day I am responsible for conducting over 75 medical reviews of drug tests to look for alternative explanations for the analytical analysis. I am trained and educated in pharmacology, pharmacokinetics and pharmacodynamics.

Sue Ramsden
Toxicology Analyst, JD

4.      Urine drugs-of-abuse testing conducted at federally certified labs undergo additional testing to check the veracity of the specimen. This testing includes identifying evidence of adulteration, substitution and dilution.

Tony Petrakovitz -
Corporate Educator

5.      Exhibit #1, attached, is a 2 page document from Redwood Toxicology Laboratory, entitled "Urine Creatinine" suggesting that subsequent testing be performed when a donor produces a dilute specimen.

5.      Dilution occurs externally when a specimen donor adds fluid to their specimen after the urine has left their body.  Dilution occurs internally when a donor ingests more fluids than their body is accustomed to ingesting. Dilution is documented in the lab as the amount of creatinine per volume of fluid.  Normal dilution levels are 100 to 250 mg/dl.

6.      Dilution may occur naturally due to a medical condition or medical guidance. Pregnancy, diabetes, high blood pressure, use of pain medications, kidney problems and use of diuretics will all cause the dilution of a person's urine. Occupational dilution occurs routinely for welders, roofers and farmers. Exercise enthusiasts can be temporally diluted for several hours after a work out.   Individuals dieting will often use diuretics causing dilution.

7.      FDA requires all federally certified labs to include a statement on all dilute test results reflecting the need for a medical review of all dilute specimens to account for alternative explanations for a dilute test.

8.      When the results of a test may be viewed as a breach of duty resulting in a loss of privileges there may exist a constitutional duty of due process requiring a Medical Review.

9.      If during that review process a medical diagnoses or legally obtained prescription for medication requiring or effecting ingestion of fluids is verified the dilution found in the specimen is to be seen as valid and necessary and no adverse action should be taken.

dot testing
drug testing
pre-employment physicals
expert witness
medical programs
workers compensation injury care

3600 Power Inn Road
Suite G
Sacramento, CA 95826

tel: 916.454.1423
Fax: 916.454.2764

cmc_sac012@yahoo.com
comprehensivemedical.us



Member of the
Drug and Alcohol Testing
Industry Association

**your first line of defense**

Accepted by FAA, FRA, FTA, FMCSA, DOT, DOD, CHP, Coast Guard, Homeland Security, Member DATIA and numerous Colleges of Forensic Examiners
Federal Drug Federally Regulated and Approved with non-federal testing performed.
Our affiliations are First Advantage, SAP, Esky Services, Choice Point, NSA, Kroll, Department of Justice, Blue Shield, Blue Cross, Medfax, Examforce, and many others.



**Comprehensive**
**medical inc**
since 1992

Declaration of Susan Ramsden PAGE 2 OF 2
March 23, 2011

Dr. Dwight Bass  M.D.

Tanweer Singh  M.D.

Arianna Sampson  Ph.C.

Sue Ramsden  Administrator

10.     A medical review officer has the option of analyzing or ordering other test results to determine if the dilution was due to recent drug use.

11.     Exhibit #2, attached, is a document by the nation's largest federally certified laboratory, Quest Diagnostics, entitled "Hair Testing for a 90 Day Drug Use History" stating that hair testing is forensically defensible.

12.     Exhibit #3, attached, is a document from Omega Laboratories, the nation's largest hair testing laboratory, entitled "Hair Testing FAQ", stating that hair testing covers approximately 90 days of use and there are no know ways to adulterate a hair test.

13.     Obtaining a hair test from a donor, when collected more than 10 days after a dilute urine test, would be a useful tool for the medical review officer to determine if a diluted specimen was an attempt to hide drug use.

I declare under penalty of perjury that the forgoing is true and correct and that this declaration was executed on March 23, 2011 in Sacramento, California.

_____  Susan Ramsden  March 23, 2011

hair testing
drug testing
pre-employment physicals
expert witness
required medical programs
workers compensation injury care

3600 Power Inn Road
Suite G
Sacramento, CA  95826

tel: 916.454.1423
Fax: 916.454.2764

cmc_sac012@yahoo.com
comprehensivemedical.us



Member of the
Drug and Alcohol Testing
Industry Association

**your first line of defense**

Registered to FAA, FRA, FTA, USCG, CAL-DOT, CHP, Coast Guard, Homeland Security, Member DATIA and American College of Forensic Examiners
Federal Court, State and Federally Regulated and Regulated with over 4 million tests performed.
Our affiliates are listed & licensed to State & Gov Services, Civil & Private NSA, Postal, Department of Justice, Blue Shield, Blue Cross, Medicare, Champus and numerous others.


Quest
Diagnostics

Home  About Us  Site Directory  Privacy Policy

Search

Background Screening | Health & Wellness | eReq

Employer Solutions =

Employer Solutions **Home** | Customer Login | Collection Site Locator

# Hair Testing for a 90-Day Drug Use History

Hair testing for drugs of abuse is the only drug-testing method available that provides up to a 90-day drug use history. This makes hair testing from Employer Solutions an ideal solution for pre-employment and random testing protocols.

Using FDA-cleared testing reagents, this lab-based test offers the advantages of easy specimen collection and highly accurate results that meet the same reference standards as urine testing. In addition, there are no known methods for sample adulteration (hair washing will not dilute the sample). Because specimen collection can be directly observed, the risk of adulteration is even further reduced.[1]

Fast turnaround of results is also available: Negative results are reported within 24 hours of receipt at the laboratory, and positive results are confirmed using gas chromatography/mass spectrometry (GC/MS) or gas chromatography/mass spectrometry/mass spectrometry (GC/MS/MS) within 48 to 72 hours. Hair testing is also forensically defensible.

When compared with urine specimen testing, hair testing provides nearly twice the number of positives and a longer detection window. In addition, Quest Diagnostics offers a comprehensive, nationwide collection network and provides online collection training.

## Standard 5-panel test:

| Drug Class | Screen Cutoff | Confirmation Cutoff |
|---|---|---|
| Amphetamines | 300 pg/mg | 300 pg/mg |
| Cocaine | 300 pg/mg | 300 pg/mg |
| Opiates* | 500 pg/mg | 500 pg/mg |
| PCP | 300 pg/mg | 300 pg/mg |
| THC-COOH | 1 pg/mg | 0.1 pg/mg |

*Confirmatory testing is available for standard or expanded opiates.

🖨 PRINT | ☒ CLOSE WINDOW



# Hair Testing FAQ

**1. What is Hair Drug Testing?**
Since hair growth is fed by the bloodstream, the ingestion of drugs of abuse is revealed by analyzing a small sample of hair. Our test method measures the drug molecules firmly added inside the hair shaft, eliminating external contamination as a source of a positive test result. Hair testing results cannot be significantly altered with shampoos or other external chemicals.

**2. What drugs are included in a standard Hair Drug Test?**
Cocaine, marijuana, opiates (Codeine, Morphine & 6-monoacetylmorphine), methamphetamine (Methymphetamine & Ecstasy), and phencyclidine (PCP). These five drug classes are mandated for testing by the Federal Government.

**3. What time period does a standard test cover?**
A standard test covers a period of approximately 90 days. The hair sample is cut as close to the scalp as possible and the most recent 1.5 inches are tested.

**4. Does hair color affect results?**
Hair color is determined by the amount of melanin in the hair. It has been shown experimentally through actual hair samples, as well as determined in court, that hair color has NO basis in fact.

**5. How fast does head hair grow?**
Studies indicate that head hair grows on the average approximately 1.3 cm (or 1/2 inch) per month.

**6. How much hair is needed?**
A standard test with GC/MS confirmation requires 60+ milligrams of hair, or approximately 90 to 120 strands. The thickness of different types of head hair (thick/coarse vs. thinning/fine) is the reason for this variation.

**7. How does Hair Testing compare to urinalysis?**
The primary differences are:
1) wider window of detection
2) inability to tamper with the test

Cocaine, methamphetamine, opiates and PCP are rapidly excreted and usually undetectable in urine 72 hours after use. The detection period for hair is limited only by the length of the hair sample and is approximately 90 days for a standard test.

At this time there are no known adulterants for hair tests. Since hair tests analyze the drug inside the hair shaft, external contaminants/chemicals have no effect.

Additional advantages include non-intrusive collection procedures, virtual elimination of test evasion.









**U.S. National Library of Medicine**
*NIH* **National Institutes of Health**

# Naproxen
(na prox' en)

URL of this page: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html

## IMPORTANT WARNING:

People who take nonsteroidal anti-inflammatory drugs (NSAIDs) (other than aspirin) such as naproxen may have a higher risk of having a heart attack or a stroke than people who do not take these medications. These events may happen without warning and may cause death. This risk may be higher for people who take NSAIDs for a long time. Tell your doctor if you or anyone in your family has or has ever had heart disease, a heart attack, or a stroke, if you smoke, and if you have or have ever had high cholesterol, high blood pressure, or diabetes. Get emergency medical help right away if you experience any of the following symptoms: chest pain, shortness of breath, weakness in one part or side of the body, or slurred speech.

If you will be undergoing a coronary artery bypass graft (CABG; a type of heart surgery), you should not take naproxen right before or right after the surgery.

NSAIDs such as naproxen may cause ulcers, bleeding, or holes in the stomach or intestine. These problems may develop at any time during treatment, may happen without warning symptoms, and may cause death. The risk may be higher for people who take NSAIDs for a long time, are older in age, have poor health, or who drink three or more alcoholic drinks per day while taking naproxen. Tell your doctor if you take any of the following medications: anticoagulants ('blood thinners') such as warfarin (Coumadin); aspirin; other NSAIDs such as ibuprofen (Advil, Motrin) and ketoprofen (Orudis KT, Actron); or oral steroids such as dexamethasone (Decadron, Dexone), methylprednisolone (Medrol), and prednisone (Deltasone). Also tell your doctor if you have or have ever had ulcers, bleeding in your stomach or intestines, or other bleeding disorders. If you experience any of the following symptoms, stop taking naproxen and call your doctor: stomach pain, heartburn, vomit that is bloody or looks like coffee grounds, blood in the stool, or black and tarry stools.

Keep all appointments with your doctor and the laboratory. Your doctor will monitor your symptoms carefully and will probably order certain tests to check your body's response to naproxen. Be sure to tell your doctor how you are feeling so that your doctor can prescribe the right amount of medication to treat your condition with the lowest risk of serious side effects.

Your doctor or pharmacist will give you the manufacturer's patient information sheet (Medication Guide) when you begin treatment with prescription naproxen and each time you refill your prescription. Read the information carefully and ask your doctor or pharmacist if you have any questions. You can also visit the Food and Drug Administration (FDA) website (http://www.fda.gov/Drugs/DrugSafety/ucm085729.htm) or the manufacturer's website to obtain the Medication Guide.

## Why is this medication prescribed?

## What side effects can this medication cause?

Naproxen may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:

- constipation
- diarrhea
- gas
- sores in mouth
- excessive thirst
- headache
- dizziness
- lightheadedness
- drowsiness
- difficulty falling asleep or staying asleep
- burning or tingling in the arms or legs
- cold symptoms
- ringing in the ears
- hearing problems

Some side effects can be serious. If you experience any of the following symptoms, or those mentioned in the IMPORTANT WARNING section, call your doctor immediately. Do not take any more naproxen until you speak to your doctor:

- changes in vision
- feeling that the tablet is stuck in your throat
- unexplained weight gain
- sore throat, fever, chills, and other signs of infection
- blisters
- rash
- skin reddening
- itching
- hives
- swelling of the eyes, face, lips, tongue, throat, arms, hands, feet, ankles, or lower legs
- difficulty breathing or swallowing
- hoarseness
- excessive tiredness
- pain in the upper right part of the stomach
- nausea
- loss of appetite
- yellowing of the skin or eyes
- flu-like symptoms
- bruises or purple blotches under the skin
- pale skin
- fast heartbeat
- cloudy, discolored, or bloody urine
- back pain
- difficult or painful urination

Google AdWords

Start with
$75 of free
advertising
on us.*

| | |
|---|---|
| Inflammation of the Bladder | Severe |
| Bloody Urine | Severe |
| Bleeding Not Related to Menstrual Period | Severe |
| Inflammation of Skin caused by an Allergy | Severe |
| Erythema Multiforme | Severe |
| Toxic Epidermal Necrolysis | Severe |
| Stevens-Johnson Syndrome | Severe |
| Skin Rash with Sloughing | Severe |
| Itching | Severe |
| Lupus-Like Syndrome | Severe |
| Muscle Pain | Severe |
| Cramps | Severe |
| Coma | Severe |
| Mental Impairment | Severe |
| Hallucination | Severe |
| Feeling Faint | Severe |
| Seizures | Severe |
| Fit | Severe |
| Fever | Severe |
| Fast Heartbeat | Severe |
| Swollen Lymph Nodes | Severe |
| Wheezing | Severe |
| Trouble Breathing | Severe |
| Chest Tightness | Severe |
| Throwing Up Blood | Severe |
| Excess Urination | Severe |
| High Blood Sugar | Severe |
| Elevation of Proteins in the Urine | Severe |
| Abnormal Liver Function Tests | Severe |
| Life Threatening Allergic Reaction | Severe |
| Giant Hives | Severe |
| Reaction due to an Allergy | Severe |
| Low Blood Sugar | Severe |
| High Amount of Potassium in the Blood | Severe |
| A Rupture in the Wall of the Stomach or Intestine | Severe |
| Hemolytic Anemia | Severe |
| Acquired Decrease of All Cells in the Blood | Severe |
| Low Blood Counts due to Bone Marrow Failure | Severe |
| Anemia | Severe |
| Decreased Blood Platelets | Severe |
| Deficiency of Granulocytes a Type of White Blood Cell | Severe |
| Decreased White Blood Cells | Severe |
| Decreased Neutrophils a Type of White Blood Cell | Severe |
| Increased Eosinophils in the Blood | Severe |
| Confused | Severe |
| Mood Changes | Severe |
| Anxious | Severe |
| Pink Eye | Less Severe |
| Dry Mouth | Less Severe |

## Adverse Reactions

Adverse reactions reported in controlled clinical trials in 960 patients treated for rheumatoid arthritis or osteoarthritis are listed below. In general, reactions in patients treated chronically were reported 2 to 10 times more frequently than they were in short-term studies in the 962 patients treated for mild to moderate pain or for dysmenorrhea. The most frequent complaints reported related to the gastrointestinal tract.

A clinical study found gastrointestinal reactions to be more frequent and more severe in rheumatoid arthritis patients taking daily doses of 1500 mg naproxen compared to those taking 750 mg naproxen (see CLINICAL PHARMACOLOGY).

In controlled clinical trials with about 80 pediatric patients and in well-monitored, open-label studies with about 400 pediatric patients with juvenile arthritis treated with naproxen, the incidence of rash and prolonged bleeding times were increased, the incidence of gastrointestinal and central nervous system reactions were about the same, and the incidence of other reactions were lower in pediatric patients than in adults.

In patients taking naproxen in clinical trials, the most frequently reported adverse experiences in approximately 1% to 10% of patients are:

### Gastrointestinal (GI) Experiences, including:

heartburn*, abdominal pain*, nausea*, constipation*, diarrhea, dyspepsia, stomatitis

### Central Nervous System:

headache*, dizziness*, drowsiness*, lightheadedness, vertigo

### Dermatologic:

pruritus (itching) *, skin eruptions*, ecchymoses*, sweating, purpura

### Special Senses:

tinnitus*, visual disturbances, hearing disturbances

### Cardiovascular:

edema*, palpitations

### General:

dyspnea*, thirst

*Incidence of reported reaction between 3% and 9%. Those reactions occurring in less than 3% of the patients are unmarked.

In patients taking NSAIDs, the following adverse experiences have also been reported in approximately 1% to 10% of patients.

### Gastrointestinal (GI) Experiences, including:

flatulence, gross bleeding/perforation, GI ulcers (gastric/duodenal), vomiting

### General:

abnormal renal function, anemia, elevated liver enzymes, increased bleeding time, rashes

The following are additional adverse experiences reported in <1% of patients taking naproxen during clinical trials and through postmarketing reports. Those adverse reactions observed through postmarketing reports are italicized.

### Body as a Whole:

anaphylactoid reactions, angioneurotic edema, menstrual disorders, pyrexia (chills and fever)

### Cardiovascular:

1                    **CERTIFICATE OF SERVICE**

2      I, _Harman Sandhu_____, hereby certify that I have

3 served a true and correct copy of;

4  Motion Pursuant to 28USC §2241

5

6

7

8 [which is considered filed/served at the moment it was delivered

9 to prison authorities for mailing as provided for in Houston v.

10 Lack, 487 U.S. 266, 101 L.Ed.2d 245 (1988)] to the following

11 listed parties/persons by placing a complete copy of the above

12 described materials in a sealed envelope affixed with the

13 appropriate pre-paid first-class United States postage:

14  Clerk of the Court                  AUSA
   U.S. District Court               c/o Clerk of Court
15  Central District of California      U.S.District Court
   312 N. Spring Street            Central District CA.
16  Los Angeles,CA.  90012          312 N.Spring Street
                                   Los Angeles,CA.90012
17

18

19 and deposited same with prison officials here at the Federal

20 Correctional Institution in Lompoc, California, on this the

21   _29_ day of _June_____, _2011___ .

22      **Pursuant to Title 28, United States Code section 1746, I**

23 **declare under penalty of perjury that the foregoing is true and**

24 **correct.  Executed this the  _29_  day of  ____June____, 2011  .**

25

26                   (Signature)_____
27                   Printed Name:
                   Federal Register #
28                   Federal Correctional Institution (Low)
                   3600 Guard Road, Lompoc, CA 93436-2705
                   No Telephone/Fax/E-Mail Available



**TERRY NAFISI**

District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-3535

Wednesday, July 13, 2011

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

HARMAN SANDHU
#17008-097
3600 GUARD ROAD
LOMPOC, CA 93436

Dear Sir/Madam:

Your petition has been filed and assigned civil case number        CV11- 5749 CJC (AGR)

Upon the submission of your petition, it was noted that the following discrepancies exist:

[X] 1. You did not pay the appropriate filing fee of $5.00.  Submit a cashier's check, certified bank check, business or corporate check, government issued check, or money order drawn on a major American bank or the United States Postal Service payable to 'Clerk U.S. District Court'.  If you are unable to pay the entire filing fee at this time, you must sign and complete this court's Prisoner's Declaration In Support of Request to Proceed In Forma Pauperis in its entirety.  The Clerk's Office will also accept credit cards (Mastercard, Visa, Discover, American Express) for filing fees and miscellaneous fees.  Credit card payments may be made at all payment windows where receipts are issued.

[ ] 2. The Declaration in Support of Request to Proceed in Forma Pauperis is insufficient because:

[ ] (a) You did not sign your Declaration in Support of Request to Proceed in Forma Pauperis.

[ ] (b) Your Declaration in Support of Request to Proceed in Forma Pauperis was not completed in its entirety.

[ ] (c) You did not submit a Certificate of Prisoner's Funds completed and signed by an authorized officer at the prison.

[ ] (d) You did not use the correct form.  You must submit this court's current Declaration in Support of Request to Proceed in Forma Pauperis.

[ ] (e) Other: _____

Enclosed you will find this court's current Prisoner's Declaration in Support of Request to Proceed in Forma Pauperis, which includes a Certificate of Funds in Prisoner's Account Form.

Sincerely,

Clerk, U.S. District Court

CPOWERS

By: _____

Deputy Clerk

CV-111 (07/06)            **NOTICE re: DISCREPANCIES FOR FILING OF HABEAS CORPUS PETITION**



**TERRY NAFISI**
District Court Executive
and Clerk of Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

Wednesday, July 13, 2011

**HARMAN SANDHU**
**#17008-097**
**3600 GUARD ROAD**
**LOMPOC, CA 93436**

Dear Sir/Madam:

A [X] Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number CV11- 5749 CJC (AGR)

A [ ] Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case number _____ and also assigned the civil case number _____

A [ ] Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and assigned civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:

[ ] District Court Judge _____

[X] Magistrate Judge    **Alicia G. Rosenberg** _____

at the following address:

[X] U.S. District Court
312 N. Spring Street
Civil Section, Room G-8
Los Angeles, CA  90012

[ ] Ronald Reagan Federal
Building and U.S. Courthouse
411 West Fourth St., Suite 1053
Santa Ana, CA 92701-4516

[ ] U.S. District Court
3470 Twelfth Street
Room 134
Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change.  If mail directed to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the case with or without prejudice for want of prosecution.

Very truly yours,

Clerk, U.S. District Court

By: ___CPOWERS_____
          Deputy Clerk

CV-17 (06/09)          **LETTER re FILING H/C PETITION or 28/2255 MOTION**